**MARK STEGER SMITH**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**2601 Second Avenue North, Suite 3200**
**Billings, MT 59101**
**Phone: (406) 247-4667**
**FAX: (406) 657-6058**
**Email: mark.smith3@usdoj.gov**

**MELISSA A. HORNBEIN**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**901 Front Street, Suite 1100**
**Helena, Montana 59626**
**Phone: (406) 457-5277**
**FAX: (406) 457-5130**
**Email: Melissa.hornbein@usdoj.gov**

**ATTORNEYS FOR DEFENDANT**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| **NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES,**<br>　　　　**Plaintiffs,**<br><br>**vs.**<br><br>**MARY C. ERICKSON, Custer Gallatin National Forest Supervisor, LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, THOMAS L. TIDWELL, Chief of the U.S. FOREST** | **CV 17-53-M-DLC**<br><br><br>**FEDERAL DEFENDANTS' BRIEF IN SUPPORT OF COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

| | |
|---|---|
| **SERVICE, an agency of the U.S. Department of Agriculture, and the U.S. FISH & WILDLIFE SERVICE, an agency of the Department of the Interior,**<br><br>**Defendants.** | |

# TABLE OF CONTENTS

Table of Authorities ............................................................................................. iii

Introduction ....................................................................................................... 1

Standard of Review............................................................................................. 1

A. National Environmental Policy Act. ............................................................. 1

B. National Forest Management Act. ................................................................. 2

C. Endangered Species Act. .............................................................................. 2

D. Administrative Procedures Act. .................................................................... 3

Argument ........................................................................................................... 5

   I. The Forest Service Chief's designation. ..................................................... 5

      a. The Chief's designation does not constitute final agency action
         requiring NEPA review. .................................................................. 6

      b. The Chief's designation does not pose unacceptable threats to
         connectivity for Canada lynx. .......................................................... 7

   II. The Clean Up Amendment. ....................................................................... 8

      a. The Clean Up Amendment did not cause any significant
         environmental effects to elk hiding cover. .................................... 10

         1. Revised standard 6(a)(5) imparts no substantive change, is
         based on best available science. .................................................... 11

         2. New big game standards maintain elk hiding cover. ............... 18

         3. Elk displacement. .................................................................... 22

      b. The Clean Up Amendment did not cause any significant
         environmental effects to old growth or dependent species........... 25

   III. The Smith Shields Project. .................................................................... 29

      a. Smith Shields maintains lynx habitat connectivity. ........................... 30

         1. Endangered Species Act compliance. ...................................... 30

           A. The data presented in *Squires.*. ......................................... 31

           B. Plaintiffs' fault interpretation of *Squires*. ......................... 32

           C. Defendants appropriately evaluated lynx habitat
             connectivity. . ..................................................................... 35

         2. Lynx connectivity presented no extraordinary circumstances
          warranting an EA under NEPA.. ................................................. 36

      b. No extraordinary circumstances from elk security or displacement...39

    c. The Smith Shields analysis of old growth and wildlife species
       complies with NEPA & NFMA....................................................44
       1. No harvest of old growth. ........................................................44
       2. Pine marten habitat correctly analyzed.....................................45
       3. Project impacts to moose correctly determined insignificant. .49
    d. Smith Shields Complies with the Healthy Forest Restoration Act. ...50
       1. Old growth and large tree retention requirement. ....................51
       2. Soils productivity standard. ......................................................55

Conclusion ...........................................................................................58

Certificate of Compliance ....................................................................59

# TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Pena*,
    865 F.3d 1211 (9th Cir. 2017) ............................................................ 48, 50

*Bicycle Trails Council of Marin v. Babbitt*,
    82 F.3d 1445 (9th Cir. 1996) ...................................................................2

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ..................................................................6

*Califano v. Sanders*,
    97 S. Ct. 980 (1977) ..................................................................................4

*Citizens to Pres. Overton Park v. Volpe*,
    401 U.S. 402 (1971) ..................................................................................4

*City of Sausalito v. O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) ..................................................................3

*Ctr. for Biological Diversity v. Ilano*,
    No. 16-CV-02322-VC
    2017 WL 3503396 (E.D. Cal. Aug. 16, 2017)...................................... 6, 7, 8

*Ecology Center v. Castaneda*,
    574 F.3d 652 (9th Cir. 2009) .................................................................57

*Forest Guardians v. U.S. Forest Serv.*,
    329 F.3d 1089 (9th Cir. 2003) ..............................................................2, 3

*Friends of the Earth v. Hintz*,
    800 F.2d 822 (9th Cir. 1986) ...................................................................4

*Friends of the Wild Swan v. Weber*,
    767 F.3d 936 (9th Cir. 2014) .................................................................39

*Great Old Broads for Wilderness v. Kimbell*,
709 F.3d 836 (9th Cir. 2013) ................................................................. 10, 54

*Hapner v. Tidwell*,
621 F.3d 1239 (9th Cir. 2010) ............................................................ 46, 47

*Helena Hunter & Anglers v. Tidwell*,
841 F. Supp. 2d 1129 (D. Mont. 2009)................................................. 13, 14

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .......................................................4, 6

*Lands Council v. Vaught*,
198 F. Supp. 2d 1211 (E.D. Wash. 2002)................................................30

*N. Plains Res. Council v. Surface Transp. Bd.*,
668 F.3d 1067 (9th Cir. 2011) .......................................................4

*Nat'l Wildlife Fed'n v. Burford*,
871 F.2d 849 (9th Cir. 1989) .......................................................4

*Native Ecosystems Council et al. v. Krueger*,
63 F.Supp.3d 1246 (D.Mont.2014)................................................48

*Native Ecosystems Council v. Tidwell*,
599 F.3d 926 (9th Cir. 2010) .......................................................48

*Native Ecosystems Council v. U.S. Forest Serv.*,
418 F.3d 953 (9th Cir. 2005) ................................................. 13, 14, 15, 17

*Native Ecosystems Council v. U.S.F.S.*,
428 F.3d 1233 (9th Cir. 2005) .......................................................51

*Native Ecosystems Council v. Weldon*,
697 F.3d 1043 (9th Cir. 2012) .......................................................18

*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 .......................................................3

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998)............................................................................2

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) ...........................................................3

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)............................................................................1

**Statutes**

5 U.S.C. §701......................................................................................3
5 U.S.C. §706(2)(A) ...........................................................................4
7 U.S.C. §6912(e) ...............................................................................9
16 U.S.C. § 824p(j)(1) ......................................................................6, 7
16 U.S.C. §1536(a)(2).........................................................................2
16 U.S.C. §1604..................................................................................2
16 U.S.C. §1604(i)..............................................................................2
16 U.S.C. §6515(c)..............................................................................9
16 U.S.C. §6591a .......................................................................5, 7, 51
16 U.S.C. §6591b.................................................................................7
16 U.S.C. §6591b(a)..........................................................................5, 6
16 U.S.C. §6591b(b)..........................................................................30
16 U.S.C. §6591b(b)(1)(A) .....................................................51, 52, 55
16 U.S.C. §6591b(b)(1)(B) ................................................................39
16 U.S.C. §6591b(c)..........................................................................30
16 U.S.C. §6591b(e)..........................................................................55
P.L. 113-79.........................................................................................5

**Regulations**

36 C.F.R. §§218.............................................................................9, 14
36 C.F.R. §220.6(c) ..........................................................................35
36 C.F.R. §281.14(b).........................................................................9
40 C.F.R. §1508.4..............................................................................1
50 C.F.R. §402.13(a) .........................................................................4
50 C.F.R. §402.02............................................................................2, 3
50 C.F.R. §402.03..............................................................................2
50 C.F.R. §402.14(a)-(b), (g)-(h)......................................................3

**Introduction**

Plaintiffs challenge three decisions of the United States Forest Service (USFS): The Smith Shields Forest Health Project, the "Clean Up Amendment" to the Gallatin Forest Plan, and USFS Chief's designation of lands under the Healthy Forest Restoration Act. Plaintiffs make various claims against each of these actions but, as set forth below, all Plaintiffs' contentions lack merit.

**Standard of Review**

**A. National Environmental Policy Act.**

NEPA requires an agency to take a "hard look" at the potential environmental consequences of its contemplated actions before making a final decision to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). NEPA establishes procedures for agencies to consider the environmental impacts of their actions, but does not dictate substantive results. *Id.* at 350. A federal agency may promulgate a categorical exclusion from NEPA review for actions "which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. 1508.4. If a proposed action falls within a categorical exclusion, the agency is not required to prepare an EA or EIS. *Id.* NEPA is satisfied if the agency "applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious.

*Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir. 1996), *as amended* (June 17, 1996).

**B.    National Forest Management Act.**

NFMA provides for forest planning and management at two levels: the forest level and the project level. 16 U.S.C. §1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998).  At the forest level, the agency develops a Land and Resource Management Plan ("forest plan"). Once approved, USFS implements the forest plan by approving or denying site-specific actions.  *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003). While NFMA requires that site-specific actions be consistent with the governing forest plan (16 U.S.C. §1604(i)), USFS's interpretation and implementation of its own forest plan is entitled to substantial deference.  *Forest Guardians*, 329 F.3d at 1097, 1099.

**C.    Endangered Species Act.**

ESA Section 7(a)(2) requires federal agencies to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. §1536(a)(2); 50 C.F.R. §§402.02, 402.03. The regulations outline a detailed process whereby action agencies consult with the appropriate expert "consulting agency" to analyze the

potential effects of a proposed action on ESA-listed species and designated critical habitat.

The action agency must engage in consultation—either "informal" or "formal," as appropriate—if its proposed action "may affect" a listed species or critical habitat. If during informal consultation the action agency determines, and the consulting agency concurs, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated and no further action is necessary. *Id. at*.§§402.13(a), 402.14(b)(1). If, however, the action agency or the consulting agency determines that the action is "likely to adversely affect" listed species or designated critical habitat, the agencies will then engage in formal consultation. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). Formal consultation leads to the issuance of a written biological opinion by the consulting agency that assesses the likelihood of "jeopardy" to the species and "destruction or adverse modification" of its critical habitat. *Id*. at §402.14(g)–(h).

## D.    Administrative Procedures Act.

ESA, NEPA, and NFMA claims are reviewed under the APA, 5 U.S.C. §701 et seq. *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004). Under the APA, judicial review of federal agency actions is "deferential." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  A court

may set aside an agency action only if it determines the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). "[T]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (abrogated on other grounds, *Califano v. Sanders*, 97 S. Ct. 980 (1977)). "The [agency's] action . . . need be only a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989); *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.") (citation omitted).

A court "must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise." *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011). "The court is not to 'act as a panel of scientists that instructs the [agency] . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty.'" *N. Plains Res. Council*, 668 F.3d at 1075 (quoting *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) overruled on other grounds).

## Argument

## I.  The Forest Service Chief's designation.

The 2014 Farm Bill amended Section 8204 of the Healthy Forest Restoration Act (HFRA) to provide for the designation of "landscape-scale areas" in the National Forests of any state experiencing insect infestations and/or disease.  P.L. 113-79; 16 U.S.C. §6591a and §6591b.  Landscape-scale areas could be designated by the Secretary of Agriculture, if requested by the Governor, as needed to address threats from insects and disease.  FS-SmithShieldsDoc.A2:8[1].  The Secretary delegated this authority to the Chief of USFS.  FS-SmithShieldsDoc.A1:5.  The designation of insect or disease-threatened landscapes allows USFS to "reduce the risk or extent of, or increase resilience to, insect or disease infestation."  FS-SmithShieldsDoc.A4:23.  Section 603 establishes a categorical exclusion for qualifying insect and disease remediation projects in designated landscapes.  16 U.S.C. §6591b(a).

On May 20, 2014, in response to a request from Montana Governor Steve Bullock, Forest Service Chief Tidwell designated 4,955,159 acres as threatened landscapes in Montana.  FS-SmithShieldsDoc.F2:14419; A4:0023.

---

[1] AR cites herein refer to records from USFS and Fish & Wildlife Service.  USFS cites refer to three records, the Clean Up Amendment, Smith Shields, and the Lynx Amendment.  The format for USFS cites is "FS-[record name]Doc.[document number]:[bates stamp page numbers]."  All Fish & Wildlife Service cites begin "FWS."

### a. The Chief's designation does not constitute final agency action requiring NEPA review.

Plaintiffs argue the Chief's designation violated the law because it occurred without a NEPA analysis. Br. 3. They argue the designation constitutes a major federal action, even though it does not mandate any particular or immediate on-the-ground management activities. *Id.* Plaintiffs are wrong.

In the 2014 Farm Bill, Congress created a categorical exclusion from NEPA for projects within landscape-scale area designations for the explicit purpose of fast-tracking such projects. 16 U.S.C. §6591b(a); *Ctr. for Biological Diversity v. Ilano*, No. 16-CV-02322-VC, 2017 WL 3503396, at *3 (E.D. Cal. Aug. 16, 2017). The designation of landscape-scale areas under HFRA §602 is merely a preliminary step USFS must take in order to propose treatment projects under §603. Congress did not intend for that preliminary step to undergo any NEPA review:

> In short, the Farm Bill embodies a congressional intent <u>not to subject area designations to NEPA analysis</u>. Congress can specify a requirement for environmental assessments and environmental impact reports when it wants to. *See* 16 U.S.C. § 824p(j)(1); *Cal. Wilderness Coal.*, 631 F.3d at 1103–05. It did not do so, and did not intend to do so, with respect to area designations.

*Ctr. for Biological Diversity*, 2017 WL 3503396, at *4 (emphasis added).

The landscape-scale designation "says nothing about the projects that will be conducted within those areas." *Id.* at 2. This reinforces the conclusion that the Chief's area designation is not "final agency action" under NEPA. Moreover, the designation does not immunize projects within the selected area from NEPA

6

review or compliance with any other law – the designation is simply a condition precedent to projects being eligible for the §603 categorical exclusion. 16 U.S.C. §6591b. It is not final agency action.

### b. The Chief's designation does not pose unacceptable threats to connectivity for Canada lynx.

Plaintiffs also claim the Chief's designation is likely to impact lynx habitat connectivity. Br. 7. Plaintiffs argue the designation has "potentially significant indirect impacts on long-term lynx persistence," again arguing that NEPA analysis was required for the designation. *Id*. Plaintiffs argue "[t]he Chief's landscape level designations seeks [sic] to relieve the USFS of its duty to take a hard look at such impacts under NEPA." *Id*. In support of this assertion, Plaintiffs point to §603, which requires projects using the categorical exclusion to consider best available scientific information to "maintain or restore… [habitat] *connectivity*." Br. 8, citing §603 (emphasis by Plaintiffs). This provision does not support Plaintiffs' argument that designation requires NEPA review, because it applies to *projects* undertaken pursuant to the §603 categorical exclusion, not to the designation of landscape-scale areas, which is addressed in §602. 16 U.S.C. §6591a.

For the same reasons, the designation also does not threaten Lynx connectivity. First, the designation of areas "will not immediately result in treatment, nor are the designations a commitment to treat all acres within designated areas." SmithShieldsDoc.A41:105. Second, when project-level treatments are proposed under §603, impacts "will be further evaluated in an open,

transparent and collaborative manner" that brings the public into the process. SmithShieldsDoc.A41:105. USFS acknowledges its obligation to comply with other laws, including NEPA and ESA. *Id.* Thus, if a project-level action actually imperils lynx connectivity, the circumstance will be extraordinary, and an EA will be required.

That determination can only be made when an actual project is proposed. USFS did that legwork when it analyzed the Smith Shields project, as detailed *infra*. It was not required to do so when the Chief made landscape-scale designations under HFRA §602.

## II. The Clean Up Amendment.

On November 2, 2015, the Gallatin Forest Plan was amended "to remove or correct outdated, ineffective, or unnecessary direction …." CleanUpDoc.016:705, 724. This "Clean Up Amendment" addressed 56 goals, standards, and guidelines of the Plan. CleanUpDoc.016:689. Plaintiffs claim that two of these items violate NEPA: Forest-wide standard 6(a)(5), pertaining to big game hiding cover, and Forest-wide standard 6(c)(2), pertaining to old growth. Plaintiffs claim these changes to Forest Plan standards on big game and old growth-dependent species triggered significant environmental concerns, requiring a supplement to the Gallatin Plan EIS instead of an EA. As set forth below, Plaintiffs' claims lack all merit.

As an initial matter, Plaintiffs failed to administratively exhaust certain

claims they now raise specific to big game hiding cover standard 6(a)(5).  *See*

Plaintiffs' objections: CleanUpDoc.528:5512-5514; CleanUpDoc.529:5515-5544.

In their June 2015 administrative objections to the Clean Up Amendment,

Plaintiffs did not object to the Clean Up Amendment in terms of elk security.

They only noted the Clean Up Amendment did not change Forest Plan elk security

standards, as no standards were included in the Forest Plan, with elk security to be

considered in the subsequent Forest Plan Revision. CleanUpDoc.529:5530-5531.

Further, Plaintiffs did not object to any elk displacement analyses because the

words "elk displacement" do not appear anywhere in their comments.

In terms of hiding cover, Plaintiffs objected only to the 40% canopy closure

method as a means of determining hiding cover, and questioned why hiding cover

is not required in limber, whitebark, and ponderosa pine forest types.

CleanUpDoc.529:5519-5529, 5533.  Plaintiffs raised no objection that the standard

reduced elk protections by applying only on National Forest System lands versus

private lands, or forested lands versus non-forested lands – claims they now pursue

in these federal court proceedings.

Judicial review is "premature and inappropriate unless the plaintiff has

exhausted the administrative review process set forth in" 36 C.F.R. §§218 et seq.

*See* also 7 U.S.C. §6912(e), 16 U.S.C. §6515(c), 36 C.F.R. §281.14(b).  Plaintiffs'

administrative claims must be specific enough to put the agency on notice of the claims to be litigated. *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846–47 (9th Cir. 2013). Here, Plaintiffs' administrative claims gave the agency no indication and no fair notice that the elk security or elk displacement would be a subject of litigation. They gave no notice the elk hiding cover standard would be litigated based on public versus private land or forested versus non-forested grounds. Accordingly, those claims should be dismissed for failure to exhaust administrative remedies.

### a. The Clean Up Amendment did not cause any significant environmental effects to elk hiding cover.

The Clean Up Amendment revised the wording of Forest-wide standard 6(a)(5), changing the hiding cover standard from "Maintain at least two thirds of the hiding cover associated with key habitat components over time" to "Vegetation treatment projects… shall maintain at least two-thirds (2/3) of Douglas fir, lodgepole pine, and subalpine fir conifer forest cover types (on National Forest System lands) with at least 40% canopy cover (on National Forest System lands) to function as hiding cover for elk…." CleanUpDoc.016:682-683. Plaintiffs advance several arguments claiming this change was environmentally significant (Br. 11-21), but all of them are wrong.

**1. Revised standard 6(a)(5) imparts no substantive change, is based on best available science.**

Plaintiffs argue the Clean-Up Amendment substantively changed the hiding cover standard, "removing" wildlife protections by sanctioning a diminution of hiding cover below "two-thirds of the total area." Br. 12-13. They claim this deviates from the best available science because it does not comport with *Canfield* or the Montana Elk Logging Study. Br. 13-14. In reality, however, revised standard 6(a)(5) is based on the best available science, and does not diminish elk hiding cover, because the same "two-thirds" standard continues to apply. CleanUpDoc.414:3303-3304.

USFS utilized the best available science by following the recommendations from a "Collaborative Overview and Recommendations for Elk Habitat Management on the Custer, Gallatin, Helena, and Lewis & Clark National Forests" (hereafter "Collaborative Recommendations") prepared by USFS and the Montana Department of Fish, Wildlife, and Parks in 2013. CleanUpDoc.482:3972. This collaborative document reviewed the latest research on elk security and how it applies in western Montana, including Hillis *et al*. 1991, Christensen *et al*. 1993, Proffitt *et al*. 2013, and Canfield *et al*. 2011. CleanUpDoc. 482:3983-92.

Contrary to Plaintiffs' claim, the Collaborative Recommendations are not at odds with previous management, the Montana Elk Logging Study, or any established scientific consensus, because two-thirds of the area of the Elk Herd

Unit was not the management metric under any of those paradigms. The cornerstone of Plaintiffs' elk hiding cover argument is that, prior to the Clean Up Amendment, USFS needed to retain two-thirds of the area of every Elk Herd Unit in hiding cover. Br. 14 ("…*total area* of the relevant landscape (e.g., an Elk Herd Analysis Unit…")). Yet the previous iteration of standard 6(a)(5) merely required maintenance of "at least two thirds of the hiding cover associated with key habitat components over time." That requirement is not correlated to any particular "total area," let alone the Elk Herd Unit. It required only that two-thirds of hiding cover be retained.

Further, the best available science never required two-thirds of the area in every Elk Herd Unit to be hiding cover. Plaintiffs' argument to the contrary traces back to Lyon *et al*. (1985) and the Montana Elk Logging Study. Br. 14. But Lyons *et al*. (1985) (which was the "Final Report of the Montana Cooperative Elk-Logging Study 1970-1985") only obliquely discussed any kind of two-thirds metric, in connection with an area closed to motorized use. FS-SmithShieldsDoc.E126:7097-98 (Lyon 1985 at 7-8). Even then, the study did not find the two-thirds metric applied to the total area of the road closure – to the contrary, the area of the road closure "was characterized by a relatively open, broken forest, with gentle terrain and easy access (one-third cover to two-thirds open)." *Id*. The study simply observed that hiding cover was "adequate and well

distributed" where there was a ratio of "at least two-thirds cover to one-third open." *Id*. Thus, Lyon *et al*. (1985) merely found that elk hiding cover, where it exists, should contain a ratio of 66% to 33%, cover to open. Neither Lyon *et al*. (1985) nor the Montana Elk Logging Study established any required correlation between two-thirds hiding cover and the Elk Herd Unit.

The Collaborative Recommendations reviewed all pertinent science and determined that hiding cover should not be assessed at any particular spatial scale:

> We concluded that a specific quantifiable cover recommendation was not supported by the scientific literature. While Lyon et al. 1985 (Coordinating Elk and Timber Management; 1985) speaks to "good cover" as being two-thirds of the total area, and Thomas et al. (1979) recommended managing for 40% cover and 60% forage for elk, to our collective knowledge, these recommendations have never been empirically tested. Blocks of forested cover were not a strong predictor of elk distribution in a recent study in Montana (Proffitt *et al*. 2012).

CleanUpDoc.482:3991 (emphasis added). Thus, the best available science does not require that two-thirds hiding cover be provided over the entire spatial scale. *See also* Wildlife Report, FS-SmithShieldsDoc.D14-63:2613.

Plaintiffs claim that two-thirds hiding cover at the Elk Herd Unit scale was recognized by the Ninth Circuit and this Court as "best available science." Br. 14, citing *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005) and *Helena Hunter & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1142 (D. Mont. 2009). But in both *Native Ecosystems* and *Helena Hunters*, the court was analyzing the Helena National Forest Plan's hiding cover requirement under

NFMA. Neither court addressed whether the two-thirds standard was best available science, but only whether the agency's decisions comported with the Helena National Forest Plan. As Judge Molloy held in the Smith Creek litigation, "the Helena National Forest has a much different hiding cover standard than the Gallatin National Forest. Therefore, Plaintiffs' reliance on *Helena Hunters & Anglers* is misplaced …." CV 08-92-M-DWM Doc. 80 at 4 (emphasis added). The Helena Plan states "The cover analysis should be done on a drainage or elk herd unit basis." *Helena Hunters*, 841 F. Supp. 2d at 1142. The Gallatin Plan, by contrast, never contained a provision establishing an area where the two-thirds metric was to be applied. Thus, any comparison between the Helena and Gallatin Plan hiding cover provisions is invalid.

Moreover, the Ninth Circuit held that the Helena National Forest's hiding cover standard "can be read to require the hiding cover percentage be calculated over the entire elk herd unit or drainage, or only over the summer range portion of that elk herd unit." *Native Ecosystems*, 418 F.3d at 962. That is three different potential scales: elk herd unit, drainage, or summer range. Thus, *Native Ecosystems* and *Helena Hunters* are not precedent for the proposition that two-thirds of the area of the Elk Herd Unit as hiding cover is "best available science." Those cases certainly say nothing relevant to scientific integrity of Gallatin Plan standard 6(a)(5).

Plaintiffs say the Clean Up Amendment reduced elk protections in four ways: (i) by applying standards only on National Forest System lands, (ii) by applying standards only to forested lands, (iii) by applying standards only to certain cover types, and (iv) by relying on 40% canopy cover. Br. 14. But Plaintiffs' arguments merely create the appearance of diminished protection by misconstruing and overstating the elk hiding cover standard before the Clean Up Amendment.

Contrary to Plaintiffs' claim (i), the pre-Clean Up Amendment did not include private land in the computation of hiding cover. As noted in "Gallatin Forest Plan Hiding Cover Standard Assessment" (Canfield, 2011), before the amendment, hiding cover and its location were determined using the Timber Stand Management Record System (TSMRS). FS-SmithShieldsDoc.E38:3523, 3526. Those data derive from Forest Service stand exams on National Forest System lands, but do not exist for non-federal lands. *Id*. Thus, hiding cover was only being counted on federal land. This makes sense, as Forest Service management constraints could only apply to National Forest System lands. Thus, the previous hiding cover standards applied solely to National Forest System lands, and the Clean Up Amendment did not diminish the area where the two-thirds standard applied when it explicitly correlated the requirement to "National Forest System lands."

Similarly, with regard to the "forested lands" argument (ii), the previous iteration of Forest-wide standard 6(a)(5) did not apply to the total area of the Elk Herd Unit, but to "…the hiding cover associated with key habitat components." As detailed above, there was no scale or spatial frame of reference for this requirement under the previous regime, so Plaintiffs cannot validly assert the Clean Up Amendment reduced the areal extent of hiding cover protections by specifically correlating it to forested acres. Hiding cover is "vegetation capable of concealing 90% of a standing big game animal at a distance equal to or less than 200 feet," so under either iteration of standard 6(a)(5), "maintaining" that cover can only apply to areas capable of providing such cover. The hiding cover standard never required the Forest to "recover" or "achieve" hiding cover, but only to "maintain" it. The validity of this construction is confirmed in the pre-amendment description of baseline hiding cover as "conifer stands in the analysis area capable of being hiding cover." FS-SmithShieldsDoc.E38:3523. This only makes sense, as the agency obviously cannot manage grasslands or lakes to "maintain" cover for an animal the size of a horse.

With regard to "cover types" (iii), the Clean Up Amendment did not reduce protections when it applied the two-thirds standard to "Douglas fir, lodgepole pine, and subalpine fir conifer forest cover types… with at least 40% canopy cover…." CleanUpDoc.0016:682-683. As noted in the Collaborative Recommendations, the

tree species or mixes of species that provide elk hiding cover (i.e., hiding 90% of an elk <=200') are those "naturally capable of having relatively dense (>=40%) canopy cover, and could include Douglas fir, subalpine fir, spruce, and lodgepole pine." CleanUpDoc.482:3991; CleanUpDoc.414:3303-3304; CleanUpDoc.532:5592. Other species, like limber pine, whitebark pine, and ponderosa pine are more valuable habitat components where they have less than 40% canopy cover. CleanUpDoc.016:683; CleanUpDoc.015:600. In other words, the Clean Up Amendment retained the same quantity of species that provide hiding cover, while optimizing concentrations of other tree species to benefit wildlife in other ways (i.e., to promote forage, accessibility, etc.). Plaintiffs fail to establish, and the record does not demonstrate, that the new standard will be less protective of "key habitat components."

Plaintiffs are also incorrect that the 40% canopy cover method is an invalid basis for assessing hiding cover (iv). The Collaborative Recommendations demonstrated that, on this Forest, 40% canopy cover is a valid proxy for concealment of 90% of a big game animal. CleanUpDoc.482:3991. The method is generally reliable despite sub-canopy influences like recent fire and topographical variations. *Id*. Plaintiffs speculate that canopy closure is an unreliable predictor of hiding cover, but utterly fail to substantiate the hypothesis. The canopy closure method has been endorsed by the Ninth Circuit, and the 40% threshold has been

specifically supported by Montana Fish, Wildlife & Parks. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012); CleanUpDoc.414:3303; FS-SmithShieldsE38:3516-17 (Canfield, 2011).

The Clean Up Amendment was not a significant change in the methodology for accounting for, or protecting, big game hiding cover. It did not diminish the protections afforded to elk.

### 2. New big game standards maintain elk hiding cover.

Plaintiffs next argue that the Smith Shields project demonstrates how the Clean Up Amendment's revision of standard 6(a)(5) diminished elk hiding cover. Br. 15-19. They point to Table 8 in the Wildlife Report, arguing it shows a clear violation of the pre-amendment two-thirds hiding cover standard. Br. 16. Table 8 shows the total existing and potential hiding cover on National Forest System and private lands within four 6th code Hydrologic Unit Codes ("HUCs") as 30,375 (30,043 existing [17,514 + 6,893 + 4.063 + 1,573] + 332 potential hiding cover that has been affected by past disturbance) acres. FS-SmithShieldsDoc.D14-63:2614. Table 7 shows the same amount of total existing and potential hiding cover on National Forest System and private lands within the Elk Analysis Unit ("EAU") (30,043 existing + 332 potential). *Id*. The Tables compare the total amount of existing hiding cover (30,043 acres, not including potential hiding acres) to the total acreage of the HUCs (86,903 acres [31,785 + 15,806 + 24,735 +

14,577]) and Elk Analysis Unit (87,109 acres).[2]  *Id.*  The result indicates that about 34% of the entire land base (either the four HUCs that contain the project area or the EAU) is existing hiding cover.

Contrary to Plaintiffs' claim, this does not show a dearth of elk hiding cover, or a substantive change from the pre-Clean Up Amendment version of standard 6(a)(5).  As detailed above, neither version of standard 6(a)(5) required that two-thirds of the area of every Elk Analysis Unit (or any other spatial frame of reference) constitute hiding cover.  Both iterations of the standard required the Forest to "maintain" two-thirds hiding cover on forested acres.  *See supra* §II(a)(1) (standard requires maintaining two-thirds of the "baseline," i.e., existing hiding cover and potential hiding cover that has not recovered from past disturbance).  Tables 7 and 8 show that past disturbance has previously impacted a total of 332 acres of hiding cover.  FS-SmithShieldsD14-63:2614.  Compared against a baseline of 30,375 acres (30,043 existing hiding cover + 332 potential hiding cover that has not recovered from past disturbance), past activities have retained roughly 99% of hiding cover - well over the 66% required to be retained under standard 6(a)(5).

---

[2] The total acreage of the four HUCs and the Elk Analysis Unit (EAU) differ only slightly – 86,903 acres vs. 87,109.  USFS analyzed both land areas.

Plaintiffs argue that existing levels of elk hiding cover are deficient, and environmentally significant, but they lack any scientific basis for the assertion. Br. 16. Indeed, their sole basis for the argument is a rhetorical house of cards: 35% of the total area consists of hiding cover, which is close to "poor" under Lyon *et al.* (1985), so any additional reductions are necessarily significant, requiring an EIS. But as set forth above, this reasoning is flawed at the root and branch. Hiding cover is not a rote measure of area, but is predicated on those stands that can conceal 90% of a standing elk at 200'. Lyon *et al.* (1985) never suggested hiding cover needed to exist at any particular spatial scale, but merely described the composition of "adequate and well-distributed" hiding cover. Best available science shows that maintaining two-thirds of the forested acres capable of providing hiding cover is protective of elk. FS-SmithShieldsDoc.D14-63:2613. This science happens to be empirically validated by the fact that elk populations in this specific area vastly exceed the target established by Montana Fish, Wildlife & Parks. FS-SmithShieldsDoc.D14-63:2610.

Plaintiffs say USFS's method is "vacuous," and as baseless as numerology. Br. 18, quoting FS-SmithShieldsDoc.D14-63:2617. Looking at the paragraph Plaintiffs quote, it is easy to understand why they are confused. The analysis rapidly juxtaposes figures showing the percentage of total area of the Elk Analysis Unit constituting hiding cover after project implementation (33%), and the

percentage by which total hiding cover is reduced across the Elk Analysis Unit (1%). *Id.* Plaintiffs' confusion stems from their failure to recognize that 33% of the total area of the Elk Herd Unit represents 100% of the baseline hiding cover (or lands capable of providing hiding cover), i.e., 30,375 acres.[3] FS-SmithShieldsDoc.D14-63:2614.

Within the Elk Analysis Unit, there are 22,595 acres of "baseline" elk hiding cover on National Forest System lands: 22,263 acres of existing hiding cover plus 332 acres of potential hiding cover. *Id.* at 2610, 2614. Standard 6(a)(5) requires that the project maintain two-thirds of that baseline hiding cover, or 14,913 acres. *Id.* at 2617. Smith Shields will harvest only 985 acres of hiding cover, so it will retain 21,610 acres of hiding cover – far more than the 14,913 minimum.[4] FS-SmithShieldsD14-63:2617. Thus, while the analysis is easily misunderstood, the data clearly indicate Smith Shields will retain hiding cover as required by the Plan, and consistent with past management.

Contrary to Plaintiffs' claim, amended standard 6(a)(5) does not allow "almost unlimited logging of hiding cover without any cumulative effects to big

_____

[3] Tables 7 and 10 measured the amount of hiding cover against the entire 87,109- acre EAU, rather than the National Forest System land within the EAU. Regardless of the scale used, Table 10 shows the insignificant impact of the project, which affects only 985 acres of hiding cover.

[4] 985 acres treated represents about 1% of the 87,109 acre Elk Analysis Unit.

game." USFS's hiding cover analysis was not limited to existing "forested" hiding cover acres, and did not fail to consider the cumulative effects of the prior Smith Creek project. Br. 17-18. Both "areas that currently provide hiding cover" and "areas that have potential to provide hiding but have been affected by disturbance" are included in the total acres accounting for hiding cover. FS-SmithShieldsDoc.D14-63:2614, 2617. The denominator in the "two-thirds" fraction therefore does not change with successive projects, and there is no danger of the hiding cover being progressively diminished below 66% over time. Canfield 2011, FS-SmithShieldsDoc.E38:3520 ("Baseline hiding cover depicts the total 'hiding cover potential' in the analysis area, and could include burned or harvested (or thinned) conifer stands, but not conifer stands that are naturally open…. With this standard, at least 2/3 of the baseline hiding cover is to be maintained over time.").

Thus, contrary to Plaintiffs' claim (Br. 17), USFS is mindful of previous harvest, and its two-thirds methodology preserves hiding cover over time. Plaintiffs' claim of unlimited logging of hiding cover without consideration of cumulative effects is incorrect.

### 3. Elk displacement.

Plaintiffs argue Smith Shields and the Clean Up Amendment violate NEPA because they do not address the connection between low security and elk

displacement, which Plaintiffs say is environmentally significant. Br. 19-21. This claim relies on Plaintiffs' hiding cover argument. *Id*. at 19 (elk distribution modified by "alterations in forested cover"; elk displacement from "eliminating hiding cover"; "displacement of elk herds from public lands in Montana is a significant cumulative effect of eliminating hiding cover."); 21 ("poor cover is already resulting in displacement"). In terms of the Clean Up Amendment, there are three major problems with this argument.

First, hiding cover is not a determining factor in elk security. As noted in the Collaborative Recommendations, Hillis *et al*. (1991) does not define elk security habitat as coextensive with hiding cover. CleanUpDoc. 482:3985. Security habitat includes some hiding cover components, but intermixed with other cover types that meet biological needs (thermal cover, forage, etc.). *Id*. The critical factor is adequate size blocks of land (at least 250 acres) far enough away from hunter-accessible roads (at least a half mile). *Id*.

Second, elk security is properly considered at the project scale. That is the level at which the Hillis and other management parameters can be applied to actual habitat with specific characteristics. That is why the Collaborative Recommendations do not call for promulgation of elk security parameters in Forest Plan standards. *Id*. at 3983 to 3988. Accordingly, the Gallatin Forest Plan does not include elk security standards, and did not include such standards prior to the

Clean Up Amendment. Thus, as noted in response to comments, the Clean Up Amendment imparted no change in habitat management for elk security. CleanUpDoc.414:3302.

Third, as shown above, revised standard 6(b)(5) does not allow an impermissible reduction of elk hiding cover. Accordingly, the Clean Up Amendment is not causing elk displacement by elimination of hiding cover. As discussed above and in greater detail below, Smith Shields complies with the revised hiding cover standard, and likewise is not causing elk displacement by the elimination of hiding cover.

Plaintiffs' elk displacement argument is also based on a contradiction: It simultaneously argues there are too many elk, but that they should have more secure habitat and more places to hide from hunters. Security habitat, according to the Collaborative Recommendations, is "intended to reduce elk vulnerability during the hunting season." CleanUpDoc.482:3984. Plaintiffs do not seek legitimate elk security, but only the façade of security that would allow more elk to be killed on public land. Some security and hiding cover, but not so much that the elk cannot be seen and killed. Plaintiffs fail to identify any science that establishes what this self-contradictory habitat looks like, let alone a legal requirement that it be addressed at the level of a Forest Plan.

As recognized in the Collaborative Recommendations, elk displacement is a separate issue from elk security (though displacement should be considered when designating security habitat). *Id*. at 3987. Elk may use habitat differently on public and private lands simply because recreational use and hunting pressures vary, and other attributes differ, regardless of the security habitat on public land. *Id*. Elk may simply choose to use private land, either as a learned behavior of for other reasons. *Id*. Plaintiffs' contention that such use can be controlled by manipulation of hiding cover finds no support in the record. Plaintiffs' arguments regarding elk displacement fail to establish any NEPA violation.

**b. The Clean Up Amendment did not cause any significant environmental effects to old growth or dependent species.**

Before the Clean Up Amendment, the Gallatin Forest Plan old growth standard (Forest-wide standard 6(c)(2)) directed USFS to strive to develop 10% of each successional stage (grass-forb, seedlings, saplings, pole, mature, old growth) "in timber compartments containing suitable timber." CleanUpDoc.016:688. As amended, the standard is as follows: "Use fire and other management tools to help achieve vegetative size and age class diversity. In part, to achieve this vegetative diversity, strive to maintain a minimum 10% old growth forest on lands classified as forested at the mountain range scale." *Id*. Plaintiffs say the change of scale for measuring old growth (from timber compartment to mountain range) reduced the amount of old growth habitat managed for wildlife species, and the reduction was

never analyzed in relationship to species habitat needs. Br. 21-22. Plaintiffs are wrong.

The amount of old growth maintained under the pre-Amendment version of standard 6(c)(2) – 10% – remains the same under the Clean Up Amendment. The scale at which that percentage is measured has changed, along with a focus on old growth rather than each successional stage. The previous standard measured successional stages by timber compartments, which typically consist of a Hydrologic Unit Code 5 area that can vary from 5,000 to 10,000 acres. The mountain range scale is more appropriate for determining old growth levels, as noted in the Clean-up Amendment EA:

> The original intent of this standard was to provide a diverse landscape. This standard is actually physically impossible to impose on a landscape due to succession occurring quickly in the younger age classes. It would lead to frequent harvest to retain the younger age classes. The vegetation of most concern for adequate representation is old growth. Also, the scale of the timber compartment is not a good scale upon which to measure this standard. The mountain range is the scale adopted as a standard because of data reliability and it makes logical sense in assessing habitat diversity across the landscape. Assessing old growth at other scales may be appropriate in certain situations.

CleanUpDoc.015:511.

The Forest fully disclosed the effects of this change on old growth and associated wildlife species. CleanUpDoc.015:602-606. Specifically, the agency stated the change in the standard "would not affect wildlife associated old growth forest because the standard still has [sic] maintaining at least 10% old growth. It is

likely, given the decreased emphasis on achieving younger age classes of forest, that more old growth forest will be maintained over the long-term and benefit species that are associated with this type of habitat." CleanUpDoc.015:605.

Plaintiffs are wrong that USFS dropped the goshawk and pine marten as Management Indicator Species. Br. 21-22. The Clean Up Amendment now identifies both the goshawk and pine marten as Indicator Species for "mature forest" which includes old growth. CleanUpDoc.015:602.

> Based on surveys done and goshawk nest sites inventoried, we know that neither goshawks nor pine marten are found exclusively in old growth forest. By association with mature forest (which includes old growth), there is more habitat that would be considered favorable and potentially be protected to provide for these species.

CleanUpDoc.015:605. Thus, not only were goshawk and pine marten not dropped as Indicator Species, they are given more turf and are more protected under the Clean Up Amendment.

Plaintiffs argue this change to the old growth standard significantly reduces wildlife protection, based on various calculations in the Third Johnson Declaration that purport to analyze Smith Shields. Br. 22. But Dr. Johnson[5] gets it wrong. In ¶45, she asserts that revised standard 6(c)(2) causes a 28% reduction in old growth:

---

[5] Plaintiffs rely on Dr. Johnson's and Mr. Juel's extra record opinions in their old growth, lynx connectivity, elk security and displacement, moose, and soils arguments. The opinions and declarations should be rejected for the reasons in the government's motion to strike.

1,410 acres under the new amendment vs. 1,963 acres under the prior plan. But

Dr. Johnson obtains the claimed 1,963 acres under the previous plan by taking 10%

of the entire 19,636-acre project area, including portions of the project area that are

non-forested (grasslands, lakes, etc.). It is not feasible to "strive to develop" old

growth on non-forested lands, because such lands do not "contain suitable timber."

CleanUpDoc.016:688. Accordingly, Plaintiffs' calculations are wrong.

The Smith Shields project does not demonstrate that revised standard 6(c)(2)

will degrade old growth habitat, because Smith Shields proposes no harvest or

treatment in old growth or potential old growth stands. FS-SmithShieldsDoc.D12-

16:1885. Plaintiffs suggest USFS ruthlessly exploits old growth because it has the

"highest economic value" (Br. 22), yet the Crazy Mountains far exceed the 10%

old growth requirement with an estimated 17% old growth. *Id.* Final Smith

Shields unit boundaries were adjusted, some units were dropped, and other units

proposed by the public were not carried forward, all with a view to preserving and

promoting old growth and old growth characteristics under revised 6(c)(2). FS-

SmithShieldsDoc.F2:14406.

Plaintiffs complain there was no map of old growth in the Smith Shields

project area. Br. 22. Yet standard 6(c)(2) never required a map, either before or

after the Clean Up Amendment. Plaintiffs suggest the revised standard diminishes

protection because it does not require old growth to be well distributed. *Id.* Yet

the revised standard imposes the 10% old growth requirement on all "lands classified as forested at the mountain range scale." That means old growth habitat will be as well-distributed as the trees themselves. It represents a better management approach because it does not require "distribution" of old growth in areas that are incapable of supporting forested habitat, like the sage brush flats that define much of the Crazy Mountains.

Furthermore, Smith Shields imposes the following management prescription: "The largest and healthiest trees, as appropriate for the forest type, habitat type, and old growth group will be retained to the extent that the trees promote stands that are resilient to insects and disease, fire, and changing climate." FS-SmithShieldsDoc.F2:14420, 14434. This design feature will promote retention of the largest and healthiest trees within each unit, and will further improve old growth in the Crazy Mountains. Thus, Smith Shields illustrates that USFS's revision of old growth standard 6(c)(2) portended no significant environmental effects, and was properly evaluated in the Clean Up Amendment EA.

### III. The Smith Shields Project.

The Smith Shields Forest Health Project will reduce the risk and extent of insect and disease infestation in the Project Area. It will reduce hazardous fuels in the Wildland Urban Interface. FS-SmithShieldsDoc.A14:49-50. The project will manage fuels and vegetation on about 1,660 acres, and includes road maintenance

and management activities.  FS-SmithShieldsDoc.F1:14394.  The project is categorically excluded under §603 of the Healthy Forests Restoration Act. 16 U.S.C. §6591b(c).  In keeping with §603, the Project was developed and implemented through a collaborative and transparent process to implement restoration treatments that "maximize the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease."  FS-SmithShieldsDoc.A15:48; 16 U.S.C. §6591b(b).  Following public notice and comment, USFS issued a decision notice approving the Project in January 2017.  FS-SmithShieldsDoc.F1:14394.

### a.  Smith Shields maintains lynx habitat connectivity.

### 1.  Endangered Species Act compliance.

USFS's ESA consultation regarding Smith Shields is well reasoned, well supported by the administrative record, and based on the best scientific and commercial data available.  *See, e.g.*, FWS_Cons_Doc_001 to 003, and 004 to 0038.  Plaintiffs' one argument to the contrary, Pls.' Mot. 8–9, is meritless.[6]

USFS concluded, and FWS concurred, that Smith Shields may affect, but is not likely to adversely affect Canada lynx, a threatened species. *See* FWS_Cons Doc_004; 002. Among the issues considered by the agencies was whether Smith

---

[6] Finding no support in their motion for summary judgment, all other ESA-based claims presented or alluded to in Plaintiffs' complaint are waived and should be dismissed with prejudice. *See, e.g.*, *Lands Council v. Vaught*, 198 F. Supp. 2d 1211, 1220 n.1 (E.D. Wash. 2002).

Shields would maintain "connectivity" of lynx habitat—they concluded that it would. *See, e.g.*, *id.* at 002, 0021, 0030 to 0034.

Plaintiffs argue only that Defendants allegedly did not consider *Squires, et al.* (2013) ("*Squires*"), a study Plaintiffs have dubbed the "current best science on conservation of lynx in the Northern Rockies." Br. 8–9. This argument fails because Defendants specifically considered *Squires*, as well as the issues Plaintiffs attribute to *Squires*.

### A. The data presented in *Squires*.

While it includes several statements about the well-established importance of maintaining habitat connectivity, *Squires* did not make significant new findings in this regard. Rather, *Squires* presented data gathered from tracking location information from 64 lynx in occupied, core lynx habitat well to the northwest of Smith Shields to show the locations of what they term "lynx movement corridors" connecting lynx populations in Canada with those in northwest Montana, and from that data extrapolated "how lynx responded to landscape heterogeneity." *See* FS-SmithShieldsDoc.E197:10413–20. The fact that the study area in *Squires* was within occupied, core lynx habitat makes it not directly applicable to areas of unoccupied, secondary habitat such as Smith Shields.

## B. Plaintiffs' faulty interpretation of *Squires*.

Plaintiffs first assert that *Squires* "concludes that lynx conservation in the lower 48 hinges in part on maintaining population connectivity between Canada and the states." Br. 8. Putting aside whether *Squires* actually "concluded" this, as opposed to simply acknowledged a long-accepted assumption, it cannot be said that Defendants did not consider this in their analysis of Smith Shields. Defendants have accepted this assumption for well over a decade. *See* FS-LynxAmendmentDoc.1966:016984 ("It is essential that landscape connectivity between lynx habitats and populations in Canada and the contiguous United States be maintained."); FS-SmithShieldsDoc.E230:012949 ("[R]etaining connectivity with larger lynx populations in Canada is important to ensuring long-term persistence of lynx populations in the U.S."). The Smith Shields consultation recognized the importance of maintaining connectivity, FWS_Cons Doc_002, 0021, 0030 to 0034, and note that FWS has concluded that "[n]ew science relevant for conservation of Canada lynx in the Norther Rockies," including *Squires*, "is consistent with information considered for the NRLMD's 2007 Biological Opinion." *Id.* at 0034. Defendants were clearly aware of and considered the importance of maintaining connectivity with Canadian populations.

Next, Plaintiffs interpret the statement in *Squires* that connectivity "is a function of movement between patches and the likelihood that patches are suitable

for resident populations," FS-SmithShieldsDoc.E197:10413, as indicating that "retention of lynx habitat connectivity requires not only that lynx can move through a given landscape, but that suitable habitat is present to allow survival outside of core habitats." Br. 9. This interpretation greatly changes the meaning of the original statement. They then assert that USFS "[d]irectly contradict[ed]" *Squires* by stating that "in unoccupied/secondary habitat a lynx may move through every now and then but not [require] a home range in the action area." *Id.* (quoting FWS_Emails_0056). This statement simply does not contradict *Squires*. *Squires* does not hold that the maintenance of connectivity requires a "home range" within any particular action area or, moreover, in unoccupied secondary lynx habitat (the areas studied in *Squires* was occupied, core habitat), nor does it suggest that connectivity is broken if a particular action area does not contain core habitat or a "home range." Obviously, for connectivity to exist, two or more habitat patches must be reachable from another, but contrary to Plaintiffs' argument, *Squires* does not articulate how close those patches must be, nor suggest that they must exist in unoccupied, secondary habitat.

Plaintiffs also highlight the unremarkable statement in *Squires* that "connectivity between lynx habitat in Canada and that in the conterminous US is facilitated by only a few putative corridors that extend south from the international border," and that "[m]aintaining the integrity of these connectivity corridors is of

primary importance to lynx conservation in the Northern Rockies." FS-SmithShieldsDoc.E197:10413; Br. 9. What Plaintiffs fail to note is that all of "these connectivity corridors" discussed in *Squires* are located in specific occupied, core habitat well northwest of the Smith Shields action area. *Compare* FS-SmithShieldsDoc.E197:10417–19 (showing all corridors regardless of size terminating just south of Highway 200 with the southernmost terminating somewhere near Marysville) *with* FWS_Cons Doc_0012 (showing the action area as approximately 16 miles northeast of Wilsall, approximately 100 miles southeast of the southernmost corridor shown in *Squires*).

Lastly, Plaintiffs claim that *Squires* indicates that "[f]or lynx connectivity purposes, dense forests are those with a canopy cover of 60% or greater," and that Smith Shields considers 40% cover adequate for wildlife purposes. Br. 10. First, Plaintiffs have not remotely established that connectivity can be achieved only through "dense forests." Second, Plaintiffs cite *Squires* to support their statement that "dense forests are those with a canopy cover of 60% or greater," Pls.' Br. 10, but the cited page does not support that statement. *See also* FS-SmithShieldsDoc.H5:14499–501 (project maintains the natural mosaic of vegetative conditions within the project area thereby retaining cover for maintaining habitat connectivity); *id.* 14504–10 (maps showing project area and unit layout retaining connectivity).

## C. Defendants appropriately evaluated lynx habitat connectivity.

After finding that the action area contains only unoccupied, secondary lynx habitat, the agencies determined that the project was "in compliance with the Northern Rockies Lynx Management Direction Standards & Guidelines with the exceptions for projects within WUI." FWS_Cons Doc_001 to 002; 004. In applying the management direction from the Norther Rockies Lynx Management Direction, Defendants found that Objective ALL O1— maintain or restore lynx habitat connectivity in and between LAUs and in linkage areas—would be met because connectivity would be maintained "throughout the West Crazies LAU," that "[v]egetation treatments would not create a barrier to lynx movements in and between the LAUs on the Crazy Mountains and linkage areas," and that "connectivity consists of an adequate amount of vegetation cover arranged in a way that allows lynx to move around." *Id.* at 0030 (*see also* Standard ALL S1). As for the vegetation management, USFS found that Smith Shields was consistent with every relevant objective, standard, and guideline. *Id.* at 0030–33. USFS also found that Smith Shields complied with the terms and conditions from the 2007 biological opinion. *Id.* at 0033. USFS has satisfied its ESA obligations through its Section 7 consultation with FWS, and that consultation was reasonable and is amply supported by the underlying administrative record.

## 2. Lynx connectivity presented no extraordinary circumstances warranting an EA under NEPA.

Plaintiffs claim that "uncertainty concerning impacts on putative corridors for lynx should have precluded a categorical exclusion" pursuant to 36 C.F.R. §220.6(c). Br. 9. Plaintiffs claim the Project represents a "potentially significant impact for a threatened species, requiring at a minimum the preparation of an Environmental Assessment." *Id.* at 10.

Plaintiffs rely on the Second Johnson Declaration for the proposition that the Project could result in a cumulative reduction of "almost half of the lynx' [sic] functional natural habitat" in the West Crazies Lynx Analysis Unit. Plaintiffs are incorrect: USFS did consider lynx connectivity in its project analysis and no significant effects preclude the §603 categorical exclusion. FS-SmithShieldsDoc.D14-65:2705.

The BA carefully considered connectivity between LAUs and linkage areas, and correctly concluded the Project would retain connectivity for a number of reasons. *Id*. First, the Project would impact only a small amount of lynx habitat. Second, the impacts to winter snowshoe hare habitat would be isolated and temporary. Third, the Project would maintain the natural mosaic of young to old stands. Lastly, the location of the treatments retaining vegetation cover in the LAU would allow for lynx mobility. FS-SmithShieldsDoc.D14-63:2702, 2705-2706, 2709; H5:14493-14510 (habitat linkage maintained between mountain ranges, within the Crazy Mountains, and within the Lynx Analysis Unit).

Additionally, over time, habitat mosaics will result in abundant, mature, and well-distributed multistory spruce-fir forests with high horizontal cover. SmithShieldsDoc.D14-65:2696. These will support snowshoe hare populations as a prey base for any lynx that may move through or reside in the area. *Id*. Thus, in the long term, the Project will benefit lynx by providing better foraging habitat.

Plaintiffs claim that "the conservation value of unoccupied secondary habitat has been downgraded pursuant to informal agreement between Defendant agencies, without any public involvement or NEPA analysis supporting forest plan amendments." Br. 9. Plaintiffs cite Squires *et al*., 2013 for their assertion that unoccupied secondary habitat is particularly important to long-term recovery. But Squires focused on corridors within occupied lynx core habitat, not within secondary unoccupied habitat. FS-SmithShieldsDoc.E197:10414, 10418, 10420. Also, Squires did not focus solely on vegetative cover, and did not unequivocally assert that more cover is always better. *Id*. Indeed, the study did not find that lynx always exhibit a strong preference for mature rather than regenerating forests. FS-SmithShieldsDoc.E197:10419. Rather, lynx preference varies by season. *Id*.

Moreover, Squires was focused largely on the degradation of connectivity through the construction of permanent barriers, like highways and increasingly heavy traffic. FS-SmithShieldsDoc.E197:10420. USFS specifically considered whether Smith Shields would impact lynx connectivity in ways the Squires study found to be potentially problematic. FS-SmithShieldsDoc.14-65:2705, 2709. But this was beyond the call of duty, because Squires *et al*., 2013 applies only to lynx

occupied habitat and core areas, *not* to the secondary unoccupied lynx habitat at issue here.  FS-SmithShieldsDoc.E197:10413-10421.

USFS applied the Northern Rockies Lynx Management Direction (Lynx Amendment) to Smith Shields even though it applies only in occupied habitat. USFS found the Smith Shields project consistent with all Lynx Amendment objectives and standards, including those directed at maintaining lynx habitat connectivity (Objective ALL O1 and Standard ALL S1).  FS-SmithShieldsDoc.D14-65:2705-2709; D14-46:2512-2521.  As noted in its concurrence letter, FWS noted the project's compliance with the Lynx Amendment in determining the Smith Shields Project is "not likely to adversely affect" the lynx: "The project would maintain connectivity, allowing transient lynx to move through the area. Treatments are not expected preclude any future use of the area by transient lynx."  FS-SmithShieldsDoc.D14-65:2677.

The Project analysis also considered best available science regarding connectivity to secondary habitat.  The Lynx Amendment is based on the 2000 Lynx Conservation Assessment and Strategy, but USFS also considered the 2013 Lynx Conservation Assessment and Strategy, and its discussion of connectivity to secondary areas providing mosaics of forest structure.[7] FS-SmithShieldsDoc.D14-

---

[7] Plaintiffs wrongly claim the Lynx Amendment has been "updated" through an "informal Lynx forest plan amendment" without public involvement by the 2013 Lynx Conservation Assessment and Strategy.  Br. 11.  There has been no change in the Lynx Amendment and no "downgrading of the conservation value of the unoccupied secondary habitat."  The 2013 Lynx Conservation Assessment and Strategy simply discusses science post-dating the 2000 Lynx Conservation

65:2695-2696.  Thus, the best available science indicates the Project will retain lynx connectivity.  Consistent with the requirements of the Healthy Forests Restoration Act, USFS "consider[ed] the best available scientific information to maintain or restore … [habitat] connectivity" in the Project area. 16 U.S.C. §6591b(b)(1)(B).  The Project will not adversely affect lynx connectivity in the West Crazies LAU, and USFS's use of the §603 categorical exclusion was appropriate.  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 949–50 (9th Cir. 2014).

### b. No extraordinary circumstances from elk security or displacement.

Plaintiffs argue the Project cannot utilize a §603 categorical exclusion because excessive roading causes a cumulatively significant effect – displacement of elk – due to reductions in elk security and hiding cover.  Br. 19-21.  Plaintiffs' argument consists of three assertions, all of which are incorrect.

First, Plaintiffs argue elk displacement is a significant issue in Montana, and any reduction in hiding cover would contribute to further displacement.  Plaintiffs base this argument on the fact that elk numbers are too high.  Br. 20.  Indeed, elk populations currently exceed management objectives for the area (populations have doubled in the last decade).  FS-SmithShieldsDoc.D14-63:2610.  But, as set forth above, hiding cover and displacement are separate issues.  Elk move to private land

---

Assessment and Strategy.  The management direction of the Lynx Amendment remains the same and was applied to the Smith Shields project.

in response to hunting pressure.  *Id.*  In the Crazy Mountains, numerous factors influence elk populations and movement.  Checkerboarding restricts public access to federal lands, which means hunting pressure is concentrated around relatively few points of public access.  FS-SmithShieldsDoc. E224:12792.  Also, elk winter range is located on private lands – meaning "displacement" may simply be migration during hunting season, depending on the weather.  *Id.*

As noted above, the Collaborative Recommendations noted that "the distribution of elk has become a primary management issue," but made clear that such distribution is a function of multiple factors, including hunter access, habitat condition, predation, climate change, stochastic events, and inherent differences between federal land and other ownerships.  CleanUpDoc.482: 3976-3977.  The study recommends providing elk security areas during the hunting season to "reduce elk vulnerability during the elk hunting season, and . . . provide animals the opportunity to meet their biological needs without making large range movements."  CleanUpDoc.482:3984.  In Smith Shields, USFS has done just that by maintaining existing elk security areas.  FS-SmithShieldsDoc.D14-63:2616.  The Project maintains elk security, cover, and habitat effectiveness, and Project activities will not affect elk populations.  FS-SmithShieldsDoc.D14-63:2620.

Second, Plaintiffs argue that "the well established connection" between security and displacement was not considered in the Smith Shields analysis. Br. 20. Yet USFS analyzed Project effects based on three well-established metrics:

- impacts to habitat effectiveness (road density);

- elk security (secure areas greater than 250 acres and more than half a mile from an open road); and

- elk hiding cover (capable of concealing 90% of an adult elk at 200').

FS-SmithShieldsDoc.D14-63:2616-2617. The Wildlife Report determined the Project would not reduce habitat effectiveness, because the 6.2 miles of temporary roads occur in areas with already high road densities, road construction and use would be staggered in time and space, and the roads would be decommissioned within three years of Project completion. FS-SmithShieldsDoc.D14-63:2616. Across the analysis area, the Project would not alter the existing road density. Locally, the Project would temporarily alter elk use adjacent to temporary roads, but the effect will be minimal and will not reduce habitat effectiveness. *Id.* Impacts to elk security would be further mitigated by a prohibition against weekend log hauling during hunting season, and a prohibition against public motorized use. *Id.* Overall, the Project will have a minimal effect on elk distribution. *Id.*

The Project would cause a minor diminution of hiding cover, as the very reason for the project is to address unhealthy stands and the fire-suppression issues

they create.  Without treatment, a high intensity wildfire or insect/disease outbreak

could result a localized or landscape-scale reduction in hiding cover.  *Id.*  Project

impacts on hiding cover depend on the particular treatment, but the cumulative

effect is a 1% reduction in hiding cover in the EAU.  FS-SmithShieldsDoc.D14-

63:2617, Table 10.  The Forest Plan requires the Project retain two-thirds of the

hiding cover on National Forest lands.  As set forth above (§II(a)(1)), the Smith

Shields Project satisfies this requirement.  *Id.*

Third, Plaintiffs claim USFS artificially inflated the amount of existing elk

security.  Plaintiffs cite the First Johnson Declaration to argue USFS incorrectly

analyzed road impacts and current elk security areas.  Br. 21, citing Dkt. 1-2 at

¶¶13-31.  But Johnson's criticisms are unfounded.

Johnson argues USFS failed to analyze the 6.2 miles of temporary roads as

against the existing road density, and failed to explain why additional roads in an

already heavily roaded area would not further affect elk.  Dkt. 1-2 at ¶¶13-16.  But

USFS analyzed this issue in great detail in the Wildlife Report: The agency

acknowledged that 29% of the Project area has a road density greater than two

miles per square mile, and that the 6.2 miles of temporary roads will occur where

road densities range from 1.1 to greater than two miles per square mile.  FS-

SmithShieldsDoc.D14-63:2616.  As it is, this area is not considered or counted as

"elk security" habitat.  Therefore, adding more roads cannot further disqualify the

area as such secure habitat. Nevertheless, 37% of the Elk Analysis Unit *is* secure habitat (32,246 acres of secure habitat out of a total 87,107 EAU acres). That amount exceeds the recommendation (30%) in both Christensen *et al*. and Hillis *et al*. FS-SmithShieldsDoc.E43:3834; E94:5796. Thus, the Project will not diminish elk security by the addition of roads, the area has sufficient elk security habitat, and USFS did not elide the issue.

Also, temporary Project roads will not be open to public motorized use, and will be decommissioned after Project implementation. *Id.* When the 6.2 miles of temporary roads are added to the GIS analysis for open road density, the total road density is unchanged. *Id.* Low-intensity routes closed to the public – like the temporary roads at issue here – can be excluded when identifying elk security areas. CleanUpDoc.482:3986. Thus, the temporary roads will not diminish elk security. This conclusion is confirmed by the best available science, i.e., the Collaborative Recommendations. CleanUpDoc.482:3972.

Contrary to Johnson's assertion, USFS did not ignore the "Hillis Paradigm" and did not miscalculate elk security by ignoring hiding cover. Dkt. 1-2,¶¶22-23. USFS designated security areas based on the Collaborative Recommendations. CleanUpDoc.482:3972. The Collaborative Recommendations are based on *Hillis et al.* (1991), *Christensen et al.* (1993), and *Proffitt et al.* (2003). The Collaborative team found that, in contrast to the landscapes referenced by Hillis,

western Montana includes many areas of more open habitat, and areas where forests and grasslands are interspersed in a mosaic of forested and open habitats. CleanUpDoc.482:3986-3987. These mosaics are operationally secure when analyzed in the context of distance to open roads. *Id.* Thus, USFS's calculation of secure areas is based on the best available science as applied to western Montana.

USFS thoroughly analyzed elk security and displacement. The best available science indicates no extraordinary circumstances from elk displacement that would preempt the §603 categorical exclusion.

### c. The Smith Shields analysis of old growth and wildlife species complies with NEPA & NFMA.

#### 1. No harvest of old growth.

Plaintiffs argue USFS ignored the habitat needs of old growth-dependent or associated wildlife when approving the Smith Shields categorical exclusion. Br. 22. They complain that old growth was not mapped for the project area. *Id.* Plaintiffs' arguments lack merit. As discussed above, Plaintiffs' claim of a 28% reduction in old growth is wrong. The Smith Shields project proposes no harvest or treatment in old growth. USFS adjusted unit boundaries and dropped entire units to preserve and promote old growth. No map is required or necessary, and the Smith Shields project will retain the largest and healthiest trees within each unit. *See infra* §III(d)(1). The Smith Shields analysis took a hard look at old growth and correctly found no significant effect or extraordinary circumstances.

## 2. Pine marten habitat correctly analyzed.

Plaintiffs claim the Smith Shields pine marten analysis was deficient under NEPA and NFMA. Br. 22-24.

Plaintiffs' NEPA claim is that "the cumulative effect of road density and fuels reduction on marten persistence represents a significant impact" precluding a categorical exclusion. Br. 24. Plaintiffs base their claim on:

1) A purportedly "significant" new study (Moriarty *et al.* (2016)) finding pine marten are "much more sensitive" to fuels reduction;

2) Plaintiffs' determination the Ninth Circuit was "misinformed" in previously finding pine marten habitat to be abundant; and

3) Plaintiffs' claim that USFS has documented no presence of pine marten in the project area.

Br. 22-23. Plaintiffs are wrong on all counts.

First, the Moriarty study occurred in California, and examined the Pacific marten – a different species than the American marten that occurs on the Gallatin Forest. FS-SmithShieldsDoc.D14-70:2774-2782. The California research area encompassed different forest vegetation and different weather patterns than occur in Montana. *Id*. The Moriarty *et al*. authors did not suggest the study's findings could apply to other areas and species outside of California, and such extrapolation would be inappropriate here: Montana has different habitat distribution, different predators and prey, and different wildlife management than California. *Id.* at 2775,

2776. Thus, Moriarty is inapt and does not demonstrate anything about the marten species in this Project area.

Next, Plaintiffs criticize the Ninth Circuit's decision in *Hapner*, 621 F.3d at 1247, arguing the court was "misinformed" in finding that marten had abundant habitat. Br. 23. Plaintiffs impugn the Circuit's determination because pine marten are considered "rare" in the Crazy Mountains. Br. 23. Plaintiffs surmise this scarcity "may be habitat related." *Id*. But Plaintiffs incorrectly conflate the Ninth Circuit's habitat finding with population surveys. While track and camera surveys indicate pine marten are relatively "rare" in the Crazy Mountains, they are very common elsewhere on the Forest. FS-SmithShieldsDoc.D14-63:2627; FS-SmithShieldsE224:12808. Moreover, even though the Crazy Mountains generally contain less habitat than the remainder of the Forest, about 24% of the project area contains preferred and suitable pine marten habitat, not far from the 29.6-37.6% estimated habitat available Forest wide. FS-SmithShieldsDoc.D14-63:2627-2628; E224:12808.

Furthermore, Plaintiffs cannot assume a correlation between population survey data and habitat. Montana law allows trapping of pine martens, so "population trends are not a function habitat availability per se." FS-SmithShieldsDoc.E224:12807-808. In fact, "access routes used for tracking may not coincide with marten habitat" in the Crazy Mountains. Thus, marten habitat

and population surveys are not necessarily correlative and Plaintiffs do not support

their argument that the Ninth Circuit was "misinformed" in *Hapner*.

Plaintiffs also incorrectly assert USFS has not documented the presence of

pine marten in the project area. Br. 23. They rely on a statement in the MIS

Assessment that suggests "it is possible that pine marten have been effectively

'trapped out'" and not recolonized in Bridger/Bangtail and Crazy Mountains. *Id.*,

citing FS-SmithShieldsDoc.E224:12808. But the MIS Assessment report states the

species is "relatively rare" in the Crazy Mountains – not that they are absent. *Id*.

Monitoring shows three observations from track surveys in the Crazy Mountains,

with one track in the Sunlight Creek drainage, which is within the project area.

FS-SmithShieldsDoc.D14-63:2627; D14-70:2780; E68:4459 (Gehman 2011). This

is in addition to three trapping records for pine marten in the Crazy Mountains.

FS-SmithShieldsDoc.D14-63:2627; D14-70:2780.

Plaintiffs also argue lynx detection surveys did not find any pine marten. Br.

23, citing FS-SmithShieldsDoc.E222:12777. But lynx detection surveys search for

lynx – not marten. Hair snares were deployed with a view to securing lynx hair,

i.e., in lynx habitat. *Id*. at 12776. Marten habitat is not coextensive with lynx

habitat. FS-SmithShieldsDoc.D14-63:2627; D14-65:2698-2699. Therefore, the

lack of marten hair in lynx snares is not evidence that marten are absent.

Moreover, as the survey acknowledges, detection failure is possible if a lynx

"chooses not to rub" or if a given sample fails to "amplify."  FS-

SmithShieldsDoc.E222:12778.  Plaintiffs fail to account for how these factors

militate across species with different statures, hair types, habitats, proclivities, and

population densities.  In short, lynx surveys do not demonstrate pine marten are

absent.

Plaintiffs' NFMA claim asserts that USFS improperly relied on a habitat

proxy analysis where the species is absent from the project area.  Br. 23, citing

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010).  Plaintiffs'

reliance on *Tidwell* is misplaced.[8]  As the Ninth Circuit held in two subsequent

cases (upholding habitat analyses where species were not detected in a project

area), *Tidwell* is limited to situations:

> …where there was no data indicating the presence of the species in the area,
> no suggestion there was difficulty monitoring the species, and a flaw in the
> Forest Service's methodology that further undermined the use of the habitat
> proxy approach.

*Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1219 (9th Cir. 2017).  Here,

the data indicate marten are present in the project area.  There is a clear suggestion

---

[8] If Plaintiffs are arguing USFS has not complied with marten monitoring
requirements under the Gallatin Forest Plan, USFS's MIS Assessment report
clearly satisfies the Forest Plan. FS-SmithShieldsDoc.E224:12807-12809.  *See
Native Ecosystems Council et al. v. Krueger*, 63 F.Supp.3d 1246,1259
(D.Mont.2014) ("The Forest Service has conducted sufficient research on the
population trends of goshawk and the pine marten . . . The Forest Service has not
violated the Forest Plan for the Gallatin National Forest.").

that monitoring is difficult, because questions persist whether monitoring transects coincide with marten access routes.  Finally, Plaintiffs' NFMA argument is based exclusively on their claim that marten are absent, not on any claimed methodological flaw in determining the amount of marten habitat in the project area (24%).  Thus, Plaintiffs' NFMA argument must fail.

In sum, the Smith Shields analysis complied with NEPA and NFMA concluding that sufficient habitat would remain so that marten would continue to occupy the area.  No preferred habitat is treated, only 3% of suitable habitat is treated, and the project retains downed and woody debris and snags to allow use of the area for travel, resting and denning.  FS-SmithShieldsDoc.D14-63:2627-2628.

### 3. Project impacts to moose correctly determined insignificant.

Plaintiffs claim the "cumulative extent and significance" of a "major impact" to moose was not analyzed.  Br. 24, citing Third Johnson Dec. ¶¶61-63. As an initial matter, all of Dr. Johnson's declarations should be rejected as improper extra record expert opinion.  Even if it were considered, ¶¶61-63 of the Third Johnson declaration say nothing about moose.  Also, Plaintiffs' claim is invalid for several reasons.

First, moose are not an old-growth obligate species but rely on mountain meadows, river valleys, swampy areas, and clearcuts in summer.  In winter, moose utilize willow flats and mature coniferous forests.

FS-SmithShieldsDoc.E208:11070.  But even to the extent moose utilize old growth, no project activities are proposed in old growth or potential old growth stands. FS-SmithShieldsDoc.F2:14406, 14420, 14434.  Riparian areas also provide summer and winter moose habitat, and the Project is designed to protect those areas by eliminating treatment in riparian zones.  FS-SmithShieldsDoc.F2:14427; D1-34:1084.

Second, moose are not identified as "experiencing significant population declines" in Montana.  Moose populations have fluctuated at the local and regional scale.  FS-SmithShieldsDoc.D14-63:2642.  But moose are ranked "S4" in Montana: "Apparently secure, though it may be quite rare in parts of its range, and/or suspected to be declining."  Montana Natural Heritage Program, Montana Field Guide http://fieldguide.mt.gov/speciesDetail.aspx?elcode=AMALC03010.

Finally, Smith Shields considered the cumulative effects of proposed treatments on moose hiding and thermal cover.  FS-SmithShieldsDoc.D14-63:2642.  The Project is not expected to affect moose populations, but "would benefit elk, moose and deer over time by maintaining habitat integrity and providing cover to a higher degree than is expected if no treatments were to occur." *Id*.  Thus, Smith Shields portends no extraordinary circumstances for moose that require documentation in an EA or EIS.

#### d. Smith Shields Complies with the Healthy Forest Restoration Act.

Plaintiffs claim the Smith Shields project does not comply with the Healthy Forest Restoration Act ("HFRA") concerning retention of old growth and large trees. They also claim the project violates HFRA by failing to comply with Gallatin Forest Plan soils standards. Br. 24-26. Plaintiffs are wrong.

### 1. Old growth and large tree retention requirement.

Smith Shields is a collaborative restoration project conducted in an area of declining forest health under the HFRA, as amended by the Agricultural Act (Farm Bill) of 2014. 16 U.S.C. §§6591a and 6591b; FS-SmithShieldsDoc.F2:14398. Plaintiffs allege a violation of 16 U.S.C. §6591b(b)(1)(A)[9], which requires restoration treatments to "maximize the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease."

Plaintiffs argue the Project imposes no requirement to "maximize" retention of large trees. Br. 24-25. Plaintiffs then reword the statute to claim it requires that "*all* of the healthy large trees should remain." Br. 25 (emphasis in original). Plaintiffs' arguments lack merit. First, the Smith Shields decision clearly requires

---

[9] HFRA does not provide a private enforcement cause of action. Therefore, agency actions allegedly violating HFRA are reviewed under the APA. *Native Ecosystems Council v. U.S.F.S.*, 428 F.3d 1233, 1238 (9th Cir. 2005).

the retention of large trees by making it a design feature, i.e., retain the "largest and healthiest trees" consistent with the purposes of the act to provide for stand resilience. FS-SmithShieldsDoc.F2:14434 (Design Feature #46). The Vegetation & Silviculture report references this design feature and establishes its implementation "through prescriptions and marking guides…." FS-SmithShieldsDoc.D12-16:1879.

Next, Plaintiffs claim HFRA requires "all" healthy large trees to remain. To the contrary, HFRA requires treatments to maximize the retention of large trees "*as appropriate* for the forest type, *to the extent that* the trees promote stands that are resilient to insects and disease." 16 U.S.C. §6591b(b)(1)(A) (emphasis added). Not all large trees are appropriate for every forest type, and retention may not promote stands resilient to insects and disease if the large trees themselves are infested or diseased. This analysis requires site-specific evaluation of the dominant forest cover, the insect and disease agent, and the individual trees.

The Smith Shields project area has experienced mountain pine beetle and western spruce budworm outbreaks in the recent past resulting in mortality of lodgepole pine and defoliation of mixed-species stands. FS-SmithShieldsDoc.F2:14399-14401; D12-16:1869-1872. The Project area is susceptible to a severe and widespread infestation, particularly if a substantial drought occurs. *Id.* Also, lodgepole pine dwarf mistletoe occurs in numerous

stands, and can spread rapidly and prevent the recruitment of healthy replacement stands. FS-SmithShieldsDoc.F2:14402. For each of these insect and disease agents, the Sivilculture Report explains the science-based treatments needed to promote resilient stands. FS-SmithShieldsDoc.D12-16:1880-1883.

Smith Shields treatments include changing species composition within units towards non-host species. For example, in certain units dominated by lodgepole pine where mountain pine beetle hazard is high, treatments may remove lodgepole pine and promote open-grown Douglas-fir. FS-SmithShieldsDoc.D12-16:1880. Treatment methods also include changing stand structure by lowering stocking levels. This provides more resources for the remaining trees to grow in height and diameter with increased vigor, making them more resistant to insects and disease. *Id.* Scientific consensus strongly supports the promotion of non-host species and lowered stocking levels to increase stand resiliency to insects and disease. *See*, *e.g.* FS-SmithShieldsDoc.D12-16:1876, 1880-1883. These treatments will also promote distribution of early seral size class and increase growth rates of the 10-14.9 size class so trees move to the largest size class (>15") more quickly. FS-SmithShieldsDoc.F2:14408; D12-16:1883. The decision explicitly requires retention of the largest and healthiest trees consistent with changing species composition and stand structure to assure resilience. FS-SmithSmithDoc.F2:14408-14409, 14420, 14434; D12-16:1876-1883; D14-65:2685-2686.

Substantial USFS judgement and expertise is involved in implementing HFRA's standard of maximizing retention of large trees *as appropriate* for forest type and *to the extent that* the trees promote resilience. A court's review of such scientific judgments and technical analyses within the agency's expertise is "at its most deferential." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846 (9th Cir. 2013). The Smith Shields project retains large trees, consistent with HFRA, as shown by the design feature and Vegetation & Silviculture report. There is no requirement to retain "all" large trees.

Plaintiffs argue USFS has not analyzed old growth or demonstrated that it is preserving old growth. Br. 25 ("…neither the public nor the decision maker can determine from the record whether old-growth habitat is being sacrificed under the guise of forest health."). But, as noted above, Smith Shields proposes no harvest or treatment in old growth or potential old growth stands. FS-SmithShieldsDoc.D12-16:1885. The record includes on-the-ground field exams identifying units with possible old growth, and avoiding treatment impacting old growth stands. FS-SmithShieldsDoc.D12-9:1567-1568; 1583-1584; 1601-1602; 1608; 1612; 1627-1628; 1637-1638; 1651-1652; 1654; 1666; 1674.[10] The field

---

[10] Plaintiffs' also assert that distribution of old growth habitat is a component of viability under the Gallatin Forest Plan. Br. 25. Plaintiffs cite the Forest Plan glossary, which defines "Viable Population" as one with "adequate numbers and dispersion of reproductive individuals to ensure the continued existence of the species population in the planning area." FS-

work done to retain all potential old growth shows that old growth is not being "sacrificed."

USFS has complied with HFRA 16 U.S.C. §6591b(b)(1)(A).

### 2. Soils productivity standard.

Plaintiffs claim Smith Shields violates HFRA because in one unit (#17), detrimental disturbance to soils exceeds Gallatin Forest Plan soil standards. Br. 25-26, citing 16 U.S.C. §6591b(e). But the "regional soils standards" Plaintiffs rely upon are not actually part of the Gallatin Forest Plan. They are in the Region 1 Supplement to Forest Service Manual (FSM) 2250 Soil Management. The specific provision appears in Soil Quality Monitoring under the "Policy" section. FS-SmithShieldsDoc.E262:14238. Because the soil standards are not part of the Gallatin Forest Plan, they cannot frame a HFRA violation.

Moreover, Unit 17 *does* comply with the Policy provision of the Region 1 Supplement. This provision requires that areas "where more than 15 percent detrimental soil conditions exist from prior activities, the cumulative detrimental effects from project implementation and restoration should not exceed the conditions prior to the planned activity…." FS-SmithShieldsDoc.E262:14238. The

---

SmithShieldsE74:4950. But Plaintiffs identify no actual violation of Forest Plan old growth standards. The Crazy Mountains contain 17% old growth – far more than the 10% required by the Forest Plan. FS-SmithShieldsDoc.D12-16:1885.

on-the-ground analysis of Unit 17 found 16% existing detrimental disturbance. FS-SmithShieldsDoc.D10-23:1411. Mindful of the Region 1 Supplement, USFS avoided further impacts:

> Based on the soils analysis, existing detrimental soil disturbance (DSD) levels in Unit 17 already exceed the Region 1 allowable DSD levels. To ensure additional soil disturbance was not created in Unit 17 during implementation, the temporary road in this unit was eliminated, as were 8 acres that could not be treated without the temporary road. It was determined that this unit can only be harvested in during winter conditions.

FS-SmithShieldsDoc.F2:14404. With these mitigation measures, USFS's soil scientist found the project would not increase detrimental soil disturbance above the existing 16%. FS-SmithShieldsDoc.D10-23:1411; D10-22:1397-1398.

Plaintiffs cite the Juel Declaration to assert mitigation is "acknowledged to be less than 100% effective." Br. 26 citing Juel Dec.¶¶19-21. This is incorrect. The Soils Report states winter logging is 90 to 100% effective as mitigation. FS-SmithShieldsDoc.D10-23:1406-1407. Detrimental soil disturbance is only anticipated where activities occur in areas with ponding or excessive wetness due to snowmelt or partial thawing. *Id*. To prevent any such disturbance, Project design features limit winter harvest to areas with 8" of settled snow depth over 3" of mineral frozen soil. FS-SmithShieldsDoc.F2:14433. Further, "[w]inter harvesting must not be conducted if ponding or excessive wetness occurs." *Id*. USFS's soil scientist concluded that correctly implemented over-the-snow logging

will create no new detrimental soil disturbance.  FS-SmithShieldsDoc.D10-23:1411; D10-22:1398.[11]

Finally, Plaintiffs argue that "[e]ven if the mitigation were 100% effective" there would be no "net improvement" resulting in a "*per se*" violation of the standard.  Br. 26.  Plaintiffs allude to a sentence in the Policy that states project implementation and restoration "*should* move toward a net improvement in soil quality."  Not only is the Manual language not a legal requirement, but "should" does not create a mandatory rule.  It is hortatory.  *Ecology Center v. Castaneda*, 574 F.3d 652, 661 (9th Cir. 2009).  Regardless, the Project requires retention of 15 tons per acre of coarse woody debris in Unit 17 in order to reduce detrimental soil disturbance to 15.2%, i.e., a "net improvement."  FS-SmithShieldsDoc.10-23:1406; D10-18:1384, 1389.

Plaintiffs show no violation of the Gallatin Forest Plan, no violation of Regional soils guidance, and no violation of HFRA.

---

[11] The Juel Declaration also claims USFS ignored other detrimental soil disturbances – specifically, "surface erosion," "severe burning" and "loss of surface organic matter." Juel Dec. ¶¶21-23.  The Project, however, adopts numerous design features to avoid such detrimental soil disturbances.  FS-SmithShieldsDoc.F2:14431-14433 (design features 24-41); F2:14428-14429 (design features 8-12); D5-14:1261-1262.

**CONCLUSION**

For the foregoing reasons, the Unites States respectfully requests that this matter be summarily adjudicated in favor of federal defendants.

**DATED** this 28th day of September, 2017.

> **KURT G. ALME**
> **United States Attorney**
>
>
> **/s/ MARK STEGER SMITH**
> **Assistant U. S. Attorney**
> **Attorney for Defendant**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(d)(2)(E), the attached brief is proportionately spaced, has a typeface of 14 points and contains 12,730 words, excluding the caption and certificates of service and compliance.

DATED this 28th day of September, 2017.

<u>**/s/ MARK STEGER SMITH**</u>
**Assistant U.S. Attorney**
**Attorney for Defendant**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of September, 2017, a copy of the foregoing document was served on the following person by the following means.

  1-2  CM/ECF
_____  Hand Delivery
_____  U.S. Mail
_____  Overnight Delivery Service
_____  Fax
_____  E-Mail

1.  Clerk of Court

2.  Thomas J. Woodbury
Forest Defense, P.C.
917 N. 7th Street, Suite One
Boise, Idaho 83702
(650) 238-8759 – phone
tom@wildlandsdefense.org
*Attorney for Plaintiffs*

**/s/ MARK STEGER SMITH**
**Assistant U.S. Attorney**
**Attorney for Defendant**