**MARK STEGER SMITH**
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Phone: (406) 247-4667
FAX: (406) 657-6058
Email: mark.smith3@usdoj.gov

**MELISSA A. HORNBEIN**
Assistant U.S. Attorney
U.S. Attorney's Office
901 Front Street, Suite 1100
Helena, Montana 59626
Phone: (406) 457-5277
FAX: (406) 457-5130
Email:   Melissa.hornbein@usdoj.gov

**ATTORNEYS FOR DEFENDANT**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | |
|---|---|
| **NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES,**<br><br>　　　　　　Plaintiffs,<br><br>　　　vs.<br><br>**MARY C. ERICKSON,** Custer Gallatin National Forest Supervisor, **LEANNE MARTEN,** Regional Forester of Region One of the U.S. Forest Service, **THOMAS L. TIDWELL,** Chief of the U.S. FOREST | **CV 17-53-M-DLC**<br><br><br><br>**FEDERAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT** |

| SERVICE, an agency of the U.S. Department of Agriculture, and the U.S. FISH & WILDLIFE SERVICE, an agency of the Department of the Interior, | |
|---|---|
| Defendants. | |

**I. Old growth.**

    **A. Smith Shields does not treat old growth.**

Plaintiffs seize upon the notion that certain data are "easily misunderstood," and try to make it the centerpiece of the agency's analysis. Doc.37 ("Resp/Rep") at 1. But the statement referred only to the mathematical calculations underlying baseline elk hiding cover. Doc.26 at 21 ("…while the analysis is easily misunderstood, the data clearly indicate Smith Shields will retain hiding cover as required by the Plan."). Thus, the statement did not apply to Smith Shields in any general sense, and certainly did not apply to old growth. It would be quite difficult to misunderstand the old growth analysis: There is no harvesting of old growth. Doc.26 at 44, 54-55.

Plaintiffs now invoke new declarations from Haskins and Johnson to claim the project will harvest old growth in Units 1b (Stand ID 22101019), 1l (Stand IDs 21060004 and 21060005), 19b (Stand IDs 22102036 and 22102065), and 19f (Stand ID 21030026). Plaintiffs are wrong. As noted in the government's brief

2

opposing supplementation of the administrative record, the Stand Diagnosis reports by USFS silviculturist Andrew Kies documented old growth in the field, and assured there would be no treatment of old growth. *See* Doc.39 at 5-6. This detailed and site-specific analysis by the agency's expert obviated the need for any successional or structural map.

Plaintiffs invoke Haskins and a new map overlay, but Haskins' source map is more than a decade old, is outmoded, and does not reflect current conditions (like the abundance of down and dead trees caused by significant disturbances during the intervening decade). *Id*. at 6-8; FS-SmithShieldsDoc.I1-2:14835; FS-SmithShieldsDoc.D12-9:1531-1674. Plaintiffs invoke the Fourth Johnson declaration to quibble with Kies' designation of "old growth," but Johnson disregards the best available science on old growth, i.e., Green et al. (1992), and disregards the three essential minimum criteria of old growth, as applied to specific forest types and habitat types. Doc.39 at 9-13. Johnson's failure to follow Green, et al. invalidates her assertions as to every stand where she claims old growth exists: Units 1b (Stand ID 22101019), 11 (Stand IDs 21060004 and 21060005), 19b (Stand IDs 22102036 and 22102065), and 19f (Stand ID

21030026) contain no old growth. *Id.*[1]

Plaintiffs' eleventh-hour, extra-record expert opinions should be rejected outright because they are improper in these APA proceedings, and under the Court's orders and the Local Rules. But even if the Court considers the content of the declarations, they are invalid and warrant no deference.

Plaintiffs also provide an old growth analysis report and map from an unrelated project on the Helena-Lewis & Clark National Forest, the "Moose Creek" project. Resp/Rep 6-7. Plaintiffs say the Moose Creek project analysis is an exemplar of HFRA compliance because it rigorously surveyed old growth, and displayed "where [old growth] isn't." *Id.* Plaintiffs again suggest USFS does not "maximize retention" of old growth in Smith Shields as required by HFRA. Plaintiffs continue to disregard the full contours of HFRA's "maximize retention" provision (§102(f)), i.e., such trees should only be retained as appropriate for forest type and to the extent they promote resilience. Doc.26 at 51-55. But regardless,

---

[1] The response brief (Doc.39) inadvertently omitted Unit 19f, Stand ID 21030026. But there too Johnson's claims of old growth are invalid. Johnson admits the field review determined this stand was not Douglas fir old growth, but argues it could be lodgepole pine old growth. Doc.38-2 ¶ 20. Johnson has no scientific basis for repudiating the Douglas fir habitat and forest type: The field review showed 60-70% of the stand is Douglas fir. FS-SmithShieldsDoc.D12-9:1665-1666. Lodgepole pine old growth criteria do not apply and Johnson's categorization of the stand is incorrect. Moreover, the largest trees in the stand are not old enough to be old growth. *Id.*

4

the Smith Shields project analysis is every bit as rigorous as Moose Creek in ensuring retention in accordance with HFRA. FS-SmithShieldsDoc.D12-16:1868-1869, 1879. USFS silviculturist Kies conducted extensive field surveys of every timber stand proposed for harvest, carefully avoiding any actions that could affect old growth. Just as with Moose Creek, USFS knows "where [old growth] isn't" – it is not in the units proposed to be harvested.

Further, the project explicitly requires retention of the largest and healthiest trees. Doc.26 at 52-54. In Unit 19f, for example, the Stand Diagnosis explicitly requires treatment to "favor big old DF [Douglas-fir], remove all else…." FS-SmithShieldsDoc.D12-9:1666.

Smith Shields complies with the HFRA.

**B. CleanUp Amendment preserves old growth.**

Plaintiffs assert USFS "effectively eliminated" any distribution requirement for old growth by changing the unit of measurement from timber compartments to mountain ranges. Wrong. As Defendants thoroughly explained in their opening brief, the amount of old growth maintained remains the same under the CleanUp Amendment. Doc.26 at 25. Moreover, the mountain range scale is more appropriate and more accurate because Forest Inventory and Analysis vegetation data can be summarized at the mountain range scale with statistically valid

confidence limits (not so for the timber compartment scale). CleanUpDocs.532:005595-005596, 015:511.

Contrary to Plaintiffs' assertion, USFS fully disclosed the effect of this change on old growth habitat and associated wildlife. CleanUpDoc.015:602-606, 642. The change would not affect wildlife because the standard continues to maintain at least 10% old growth, and "given the decreased emphasis on achieving younger age classes of forest" in the mountain range vs. timber compartment scale, more old growth forest will likely be maintained under the CleanUp Amendment. Doc.26 at 26. Moreover, as USFS explained, distribution of old growth is now focused appropriately on landscapes in order to provide habitat diversity across each landscape. *Id*.

Plaintiffs next raise an entirely new argument, that no science supports the 10% old growth retention standard and USFS "refused to consider" a 20-25% retention requirement. Resp/Rep 10. Plaintiffs improperly raise this argument for the first time in their reply, and the Court should reject it. *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 846 (9th Cir. 1976) ("It is not proper for the court to consider new arguments raised in a reply.").

Nonetheless, contrary to Plaintiffs' allegation, USFS reviewed and considered Plaintiffs' 10% objection, and followed up by requesting references for

6

the assertion. CleanUpDoc.532:5595-5596. Plaintiffs provided four citations. USFS researched the citations and conducted its own additional literature review. None of Plaintiffs' documents provided compelling evidence for their argument for a higher old growth standard. USFS's biologist explained that additional literature refuted Plaintiffs' assertion that bird species are more productive in old-growth forest. CleanUpDoc.530:5558.

### C. Smith Shields benefits moose.

Plaintiffs claim USFS was "unresponsive" to their moose arguments. Resp/Rep at 12. Plaintiffs are wrong. USFS fully responded to each of the moose arguments in Plaintiffs' brief (Doc.13 at 24): moose populations are ranked as "apparently secure" in Montana, and the project will benefit moose over time by maintaining more habitat and providing more cover than if no treatments occurred. Doc.26 at 49-50.

Paragraphs 74-85 of the Third Johnson declaration are improper, extra-record, unauthorized expert opinion. Docs.29, 36, 39. Furthermore, when Plaintiffs make legal arguments (like that the project does not comply with the Forest Plan big game winter range standard [e.g., Doc.1-4 at ¶79]) and factual/scientific arguments (like that moose habitat is too fragmented to be usable [e.g., *id.* at ¶81]) through extra-record declarations, they circumvent this Court's

order limiting the maximum number of words per brief. Doc.8 at 2. They violate Local Rule 7.1(d) by adding more than 120 pages of argument through six extra-record declarations.

USFS fully responded to the arguments legitimately advanced in Plaintiffs' briefs: Smith Shields presents no extraordinary circumstances for moose requiring an EA or EIS.

**II. Smith Shields preserves elk security habitat.**

Plaintiffs' analysis of elk security habitat is wrong in several ways. First, Plaintiffs' claim USFS completely disregards hiding cover when assessing elk security. *See*, e.g., Resp/Rep 15-19 ("…hiding cover no longer has anything to do with elk security."). This is simply false. USFS has never divorced the concept of elk security from elk hiding cover. As clearly stated in the government's opening brief (Doc.26 at 23), security habitat <u>includes hiding cover components</u>, intermixed with other cover types that meet biological needs, like thermal cover, forage, etc. CleanUpDoc. 482:3985. Thus, USFS incorporated hiding cover into its assessment of elk security. Plaintiffs make this mistake over and over again in their brief (*see* pgs. 12, 15, 16, 17, 19), and it undermines their entire analysis.

Second, Plaintiffs fail to identify any minimum standard of elk security that USFS supposedly violated. Elk security claims can only apply to the Smith

Shields project (Doc.26 at 23), but because their elk security arguments are unmoored to any objective criteria, Plaintiffs can only make amorphous claims that the project's elk security analysis was flawed. Plaintiffs hypothesize, for example, that a trophy bull standing "in the middle of a clearcut" would not be secure from human hunters if that fictive clearcut extended a half mile to a road. Resp/Rep 12. As an initial matter, if Plaintiffs believe they could bag a trophy elk by stalking over half a mile in plain view of that bull, they have clearly never hunted elk.

But, moreover, Hillis et al. (1991) considered vegetation density, topography, road access, hunter-use patterns, and elk movements as variables, and the agency incorporated all of those considerations in its analysis. FS-SmithShieldsDocE94:5796. Our trophy bull, a half-mile from road end, would be even more secure when atop a steep hill, or when otherwise screened by topography. USFS incorporates hiding cover into its analysis of security cover – so the bull would also be screened by vegetation. Plaintiffs utterly fail to show any specific area where project activities will actually diminish elk security. There are no such effects, because all treatments occur well within a half-mile of open roads, and therefore cannot effect elk security habitat. FS-SmithShieldsDoc.D14-63:2660-2662 and 2613-2614.

Third, contrary to Plaintiffs' claim, the 2013 "Collaborative Overview and

Recommendations for Elk Habitat Management" is indeed "best available science." CleanUpDoc.482:3972. The Collaborative Recommendations reviewed all pertinent science – i.e., the published and peer-reviewed studies Plaintiffs crave (e.g., Lyon et al. (1985), Thomas et al. (1979), Proffitt et al. (2012)) – and applied those studies to the elk habitat in this specific National Forest. *Id*. at 482:3991. Plaintiffs fail to show any defect in the Collaborative Recommendations.[2]

Fourth, Plaintiffs' hiding cover arguments continue to ignore the reality that the two-thirds requirement cannot be applied across the entire area of the elk herd unit. Hiding cover is "vegetation capable of concealing 90% of a standing big game animal at a distance equal to or less than 200 feet," so under standard 6(a)(5), "maintaining" that cover can only apply to areas capable of providing such cover. CleanUpDoc.508:5076. The hiding cover standard never required the Forest to "recover" or "achieve" hiding cover across every acre of the elk herd unit. The validity of this construction is confirmed in the pre-amendment description of baseline hiding cover as "conifer stands in the analysis area capable of being

---

[2] The CleanUp Amendment EA did not tier to the 2013 Collaborative Recommendations. Tiering only occurs between NEPA documents, and the Cooperative Recommendations are not a NEPA document. USFS cites and relies upon the Recommendations as a collection of the best available science specifically applied to this project area, nothing more.

hiding cover."  FS-SmithShieldsDoc.E38:3523.

Plaintiffs' arguments to the contrary boil down to semantic mistakes.  The Montana Elk Logging Study (AKA Lyon, et al. (1985)) described a specific area closed to motorized use, where the "good" hiding cover comprised 66% of the "total" of that particular area.  FS-SmithShieldsDoc.E126:7097-98.  It did *not* say 66% of every Elk Herd Unit needed to have "good" cover.  Sleep scientists agree we humans should keep our bedrooms as dark as possible, and cool, to promote optimum sleep.  That does not mean we want the rest of our houses to be dark and cold.  Similarly, the requirement to "maintain" 66% hiding cover keeps the blinds drawn on elk hiding cover where it exists, without the need to expand it to other important components of elk habitat.

Forage habitat, for example, is a key attribute affecting elk populations. CleanUpDoc.482:3977.  It exists in tension with hiding cover.  Without treatment, big game forage in the Smith Shields area will diminish as conifers grow and shade out plants on the forest floor.  FS-SmithShieldsDoc.D14-63:2615. Foraging habitat (which is currently bad) will eventually disappear, displacing elk as they are forced to move to areas with food (despite the prevalence of hiding cover).  *Id*.  Proposed treatments will "open up the forest canopy and allow increased sunlight to reach the forest floor and stimulate growth of grasses, forbs,

11

and shrubs that provide forage for elk." *Id*.

Thus, hiding cover throughout the elk herd unit is not good for elk, and is not required by the Forest Plan or best available science. Rather, the two-thirds requirement applies to hiding cover where it currently exists.

### III. Plaintiffs failed to exhaust administrative remedies.

Administrative claims must be specific enough to put the agency on notice of the claims to be litigated. *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846-47 (9th Cir. 2013). The agency had to have an opportunity to address the same issue now raised in federal court. *Id*. Plaintiffs failed to put USFS on notice of their Clean Up Amendment claims regarding elk security, big game hiding cover standard (except as to 40% canopy closure method), and elk displacement. Doc.26 at 9 -10.

Plaintiffs fail to show where or how they exhausted their elk security or elk displacement claims. Indeed, the words "elk displacement" occur nowhere in Plaintiffs' administrative comments. Plaintiffs say they administratively exhausted elk hiding cover because they raised the general issue – i.e., that the two-thirds standard was "eliminated" – without detailing supporting arguments. Resp/Rep 22. But USFS never proposed elimination of the two-thirds standard. Plaintiffs never hinted that what they really meant was that a two-thirds

12

requirement must be applied across all acres of the elk herd unit rather than the existing acres of hiding cover (the claim they now advance in federal court). USFS never had a chance to respond to that claim in the administrative process, so Plaintiffs failed to exhaust, and their claim must be rejected. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002).

**IV. Smith Shields does not affect lynx connectivity.**

Plaintiffs offer one substantive paragraph (Resp/Rep 24) in response to Defendants' ESA and NEPA arguments on lynx connectivity. Doc.26 at 30-39. First, Plaintiffs apparently concede the Smith Shields project area is not inhabited by lynx, and offer no evidence the area is suitable for residents. Resp/Rep 24. Second, they suggest *Squires* (2013) could be read as supporting a conclusion about lynx connectivity beyond the populations in Canada and northwest Montana. This interpretation is untenable. The Squires study area and corridors are all located in areas of resident lynx use. Squires nowhere states any particular findings apply to areas used by transient lynx. Doc.26 at 33-34; FS-SmithShieldsDoc.E197:10413-19. Third, Plaintiffs refer to the "nonsensical dismissal of new science" but do not identify what "new science" has been "dismissed." Resp/Rep 24. Defendants considered *Squires* (2013) specifically and the importance of maintaining lynx connectivity more generally. Doc.26 at

13

32. Plaintiffs offer no argument or evidence to the contrary. Fourth, Plaintiffs refer to "designated migration corridors," but there is no such thing – Lynx are not a migratory species. *See, e.g.*, FS-SmithShieldsDoc.E230:12942 (lynx may disperse, e.g., if prey becomes scarce, but no discussion of migration).

**V. Farm Bill / Chief's designation not subject to NEPA review.**

The Chief's 2014 designation of 4,955,159 acres of insect and disease-threatened landscapes across Montana imposes no NEPA duty. The designations are just a preliminary planning step that do not impact the environment. Doc.26 at 5-8. Plaintiffs' arguments to the contrary are unavailing.

First, the designations neither withdraw areas from public review under NEPA nor are similar to Forest Plans. They merely establish a zone where projects are potentially eligible to use the statutory categorical exclusion, provided public involvement and analytical processes occur. 16 U.S.C. §6591b(a)(1); FS-SmithShieldsDoc.A4:0023. Also, area designations do not necessarily equate to *any* environmental effects (let alone significant effects), because implementation of Section 603 projects is discretionary. 16 U.S.C. §6591b(a)(d)(1), §6591b(a).

Unlike Forest Plans, area designations do not establish any goals, standards or guidelines. The areas remain subject to the relevant direction of the existing Forest Plan, for which an EIS was prepared. The area designations establish no

14

management direction and have no direct or indirect environmental effects required to be considered under NEPA. Federal actions that do not impact the environment at all – like designating a geographic area – trigger no NEPA obligations. *Douglas Cty. v. Babbitt*, 48 F.3d 1495, 1505-06 (9th Cir. 1995). Concordantly, USFS's NEPA regulations require NEPA documentation only for actions that will "cause effects on the natural and physical environment" and, even then, only once the proposed action has matured to a point that its "effects can be meaningfully evaluated." 36 C.F.R. § 220.4(a)(1), (3).

Second, this case is distinct from *California Wilderness Coalition*, 631 F.3d 1072, 1080 (9th Cir. 2011). The statute in *California Wilderness* (the Energy Policy Act) provided that "nothing in this section affects any requirement of an environmental law of the United States, including [NEPA]." *Id*. By contrast, in the 2014 Farm Bill, Congress created a categorical exclusion for projects within landscape-scale area designations for the explicit purpose of fast-tracking such projects.[3] 16 U.S.C. §6591b(a).

The *California Wilderness* court also found the decision to site electric transmission corridors in certain locations to be final agency action because it was

---

[3] Plaintiffs concede that "no NEPA could have been reasonably intended" for initial designations under the Farm Bill, because "they were to happen within a 60-day window…." Resp/Rep 27.

15

the ultimate exercise of the agency's authority. 631 F.3d at 1100. By contrast, the designation of landscape-scale areas is merely a preliminary step before proposing treatment projects under Section 603. *Ctr. for Biological Diversity v. Ilano*, No. 16-CV-02322-VC, 2017 WL 3503396, at *3 (E.D. Cal. Aug. 16, 2017).

*Northern Alaska Envtl. Ctr. v. Kempthorn*, 457 F.3d 969, 976 (9th Cir. 2006), is likewise distinct. The decision at issue there was BLM's approval of federal land leases, which represented an irretrievable commitment of resources. *Id*. In contrast, the landscape designations do not make any commitment to project implementation.

**VI. Region One soils "standards."**

Plaintiffs cannot controvert USFS documentation showing Smith Shields Unit 17 complies with "Regional Soils Standards." Doc.26 at 55-57. Moreover, Plaintiffs admit the "Regional Soils Standards" are not part of the Gallatin Forest Plan. Resp/Rep at 30. Because Plaintiffs assert an HFRA violation on the basis of Forest Plan consistency, Plaintiffs' admission torpedoes their HFRA soils claim.

Plaintiffs excerpt quotes from a 2013 email where a USFS soil scientist discusses the CleanUp Amendment's snag standard. CleanUpDoc.174:2128-2129. The email discusses soil productivity, adequate nutrient pools, and applying BMPs, in accordance with various statutes (including the Multiple-Use Sustained

16

Yield Act and NFMA) and Forest Plan objectives (including Goal #12). The scientist concludes the CleanUp Amendment meets all direction. *Id*. Plaintiffs completely fail to correlate the email to Smith Shields. They merely speculate that "[p]resumably, all of the laws cited still apply." Resp/Rep 31. But this cryptic suggestion conveniently elides whether or how Plaintiffs challenge Smith Shields under any of the "laws cited" – let alone whether such laws actually create an enforceable standard applicable to Smith Shields. The Smith Shields Soils Report, by contrast, examines all applicable statutory and Forest Plan management direction, finding the project complies. FS-SmithShieldsDoc.D10-23:1408-1412.

**CONCLUSION**

For the foregoing reasons, this matter should be summarily adjudicated in Defendants' favor.

**DATED** this 17th day of November, 2017.

**KURT G. ALME**
**United States Attorney**


**/s/ MARK STEGER SMITH**
**Assistant U. S. Attorney**
**Attorney for Defendant**

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the attached brief is proportionately spaced, has a typeface of 14 points and contains 3,245 words, excluding the caption and certificates of service and compliance.

**DATED** this 17th day of November, 2017.

> **/s/ MARK STEGER SMITH**
> **Assistant U.S. Attorney**
> **Attorney for Defendant**

# CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of November, 2017, a copy of the foregoing document was served on the following person by the following means.

| | |
|---|---|
| __1-2__ | CM/ECF |
| _____ | Hand Delivery |
| _____ | U.S. Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| _____ | E-Mail |

1. Clerk of Court

2. Thomas J. Woodbury
Forest Defense, P.C.
618 Rollins St.
Missoula, Montana 59801
(650) 238-8759 – phone
tom@wildlandsdefense.org
*Attorney for Plaintiffs*


**/s/ MARK STEGER SMITH**
**Assistant U.S. Attorney**
**Attorney for Defendant**