

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

NATIVE ECOSYSTEMS COUNCIL
and ALLIANCE FOR THE WILD
ROCKIES,

          Plaintiffs,

    vs.

MARY C. ERICKSON, Custer Gallatin
National Forest Supervisor, LEANNE
MARTEN, Regional Forester of
Region One of the U.S. Forest Service,
THOMAS L. TIDWELL, Chief of the
U.S. Forest Service, an agency of the
Department of Agriculture, and the
U.S. FISH & WILDLIFE SERVICE,
an agency of the Department of the
Interior,

          Defendants.

CV 17–53–M–DWM


OPINION &
ORDER

## INTRODUCTION

This case concerns three decisions of the United States Forest Service

("Forest Service"):  (1) the Forest Service Chief's designation of approximately

five million acres in Montana ("Designation") pursuant to the 2014 Farm Bill

Amendment to the Healthy Forests Restoration Act ("HFRA"); (2) approval of the

Smith Shields Forest Health Project ("Project") via categorical exclusion; and (3)

approval of the "Clean Up Amendment" ("Amendment") to the Gallatin Forest

Plan ("Plan"). (Doc. 1 at ¶ 2.)[1] Plaintiffs Native Ecosystems Council and Alliance

for the Wild Rockies (collectively "Plaintiffs") claim that the Forest Service and

the Fish and Wildlife Service (collectively "Defendants") violated the National

Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), the

National Forest Management Act ("NFMA"), HFRA, and the Administrative

Procedures Act ("APA"). (*Id.* at ¶ 8.) The parties have filed cross-motions for

summary judgment. Plaintiffs also seek to supplement the record, while

Defendants filed a motion to strike. For the following reasons, the Defendants'

motions are granted and the Plaintiffs' motions are denied.

**BACKGROUND**

The factual background for this case involves three different Forest Service

decisions, discussed below.[2]

## I. Montana Landscape Designation

In 2014, HFRA was amended to provide for the designation of "landscape-

---

[1] The Complaint also states that it challenges authorization of the Northern Rockies Lynx Management Direction, (Doc. 1 at ¶ 2), but the case only implicates the Lynx Amendment to the extent it applies to the three Forest Service decisions.

[2] This case predominantly involves two Forest Service administrative records: the record for the Smith Shields Projects, cited as "SmithShields [page #]" and the record for the Gallatin Forest Plan Clean Up Amendment, cited "CleanUp [page#]". The case also involves the Fish and Wildlife Service record for the Smith Shields Project, which is cited "SmithShieldsFWS [page #]."

scale areas" in the National Forests of any state experiencing insect infestations and/or disease. P.L. 113-79; 16 U.S.C. §§ 6591a, 6591b. The amendment provided a 60–day period within which the Secretary, "if requested by the Governor of the State," was required to "designate as part of an insect and disease treatment program 1 or more landscape-scale areas . . . experiencing an insect or disease epidemic." 16 U.S.C. § 6591a(b)(1). The Secretary delegated this authority to the Forest Service Chief. SmithShields 000001, 7. At the subsequent request of Montana Governor Steve Bullock, Forest Service Chief Thomas Tidwell designated 4,955,159 acres as threatened landscapes in Montana. *Id.* at 000023, 014419. The Project area was part of the Designation. *Id.* at 014398.

## II.    Smith Shields Forest Health Project

The Project is located in the Crazy Mountains, approximately 16 miles northeast of Wilsall, Montana.[3] *Id.* The Project area covers 19,000 acres at the border of Meagher and Park Counties, but the actual treatment and activity area is

---

[3] The Project is adjacent to an earlier Forest Service vegetative treatment project, the Smith Creek Project. The Smith Creek Project involved vegetation treatments on 810 acres and prescribed burning on an additional 300 acres. SmithShields 015841. The Smith Creek Project EA was the subject of significant litigation, culminating in *Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010), which held the Forest Service violated NFMA by not ensuring the project complied with the Forest Plan requirement that least two-thirds of hiding cover associated with elk habitat components be maintained. *Id.* at 1251. The history of the Smith Creek Project is laid out in depth in the Smith Creek Affirmation of Finding of No Significant Impact. *Id.* at 015839–40. Following remand, the Forest Service authorized the Smith Creek Project. *Id.*

approximately 1,660 acres. *Id.* It is located in the Wildland Urban Interface, as defined by the Meagher and Park County Community Wildfire Protection Plans. *Id.* In the last fifteen years, the Project area has experienced western spruce budworm outbreaks resulting in defoliation, crown dieback, and small tree mortality. *Id.* at 014399. The area has also suffered from mountain pine beetle infestation, including at epidemic levels during an outbreak from 2006 to 2010. *Id.* at 014400. Lodgepole pine dwarf mistletoe has also been found in the Project area. *Id.* at 014402.

The Project was designated as part of an insect and disease treatment program in accordance with Title VI, Section 602, of HFRA [16 U.S.C. § 6591 *et seq.*], as amended by Section 8204 of the 2014 Farm Bill. SmithShields 014398. Put simply, the Project was designated under the Farm Bill amendment. The Forest Service approved the Project pursuant to 16 U.S.C. § 6591b(a), which provides that certain projects may be categorically excluded from NEPA's requirement that agencies prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The Project was subject to scoping and public notice. SmithShields 014416. Notice was provided to over 150 individuals and organizations, and development included a public meeting and field trip. *Id.* at 014416–17.

4

The Project's purpose is to "reduce vegetative susceptibility to subsequent insect and disease activity to minimize tree mortality that would contribute to surface fuel loadings," and to "maintain fuel loadings at levels that are not conducive to active, crown independent wildland fires during severe weather conditions." *Id.* at 014403. To that end, the Project includes fuel reduction treatments and vegetation management activities including intermediate and regeneration, or clearcut, harvest. *Id.* at 014404. Specifically, the Project will result in 351 acres of "regeneration harvest" (including clearcutting, clearcutting with patches, clearcutting whole tree yards, and group selection), and 1,309 acres of "intermediate harvest" (including sanitation/salvation, salvage/stand improvement, and thinning). *Id.* at 014405. It will also involve road management activity, including 16.0 miles of maintenance on secondary routes, 1.4 miles of maintenance on alternate routes, 20.3 miles of maintenance on primary routes, and 6.2 miles of temporary road construction. *Id.*

**III.  Gallatin Forest Plan Clean Up Amendment**

On November 2, 2015, the Gallatin Forest Plan was amended to "remove or correct outdated, ineffective, or unnecessary direction from the Gallatin Forest Plan given that full revision of the Plan is not anticipated to be completed until 2019 or later." CleanUp 000739. The Amendment modified or removed 56 goals and standards in the Forest Plan. *Id.* At issue in this case are Amended Forest-

5

wide Standards 6(a)(5) (big game hiding cover) and 6(c)(2) (old growth). *Id.* at 000354, 000358–59.

The Forest Service prepared an Environmental Assessment ("EA") as part of the amendment process. *Id.* at 000320–498. The EA included an initial public comment period in 2009, and, following slight revision, a second comment period in 2011. *Id.* at 000774. The Draft EA was made available for public comment in 2014. *Id.* Following completion of the EA, the Forest Service issued a Finding of No Significant Impact, determining that the changes proposed in the Amendment "will not have significant impacts on the quality of the human environment," and that preparation of an EIS was not necessary. *Id.* at 000775.

**IV.    Procedural History**

Plaintiffs participated in the comment process for both the Project and the Amendment. SmithShields 000527, 000706; CleanUp 001045, 001058, 003218. Plaintiffs also submitted objections regarding both decision. SmithShields 014452; CleanUp 005512, 005515.

Plaintiffs commenced this suit on April 27, 2017. (Doc. 1.) The Complaint alleges violations of the ESA, NEPA, NFMA, and HFRA. Plaintiffs bring seven claims, alleging: (1) the Forest Service Chief's designation of approximately five million acres in Montana pursuant to the 2014 Farm Bill Amendment to HFRA violated NFMA, NEPA, and the ESA; (2) the Project threatens Canada lynx in

6

violation of NEPA, NFMA, and the ESA; (3) the Amendment and the Project violate NEPA and NFMA as relates to the big game hiding cover standard (Amended Standard 6(a)(5)); (4) the Amendment and the Project violate NEPA and NFMA as relates to the old growth standard (Amended Standard 6(c)(2)); (5) the Project violates HFRA by failing to consider best available science and maximize old growth retention; (6) the Project violates NEPA and NFMA by relying on a Management Indicator Species (pine marten) that is not present in the Project area; and (7) the Project violates NEPA and NFMA by failing to ensure against irreversible losses in soil productivity. (Doc. 1 at 30–40.)

Plaintiffs filed, and subsequently withdrew, a motion for preliminary injunction. Defendants filed their Answer on July 14, 2017. Meagher and Park Counties requested, and were granted, leave to file an amicus brief in support of the Project, as were the State of Montana and the Montana Department of Natural Resources and Conservation.[4] Plaintiffs filed a motion for summary judgment on August 28, 2017, and Defendants filed a cross-motion on September 28, 2017. Defendants filed a motion to strike four declarations attached to the Complaint on September 28, 2017, and Plaintiffs filed a motion to supplement the record with two additional declarations on October 27, 2017. On January 31, 2018, the case

---

[4] In general, the briefs argue (1) there is significant local need for the Project; (2) the Project will support forest health, and (3) the Designation was legal and appropriate. (Docs. 20, 42).

was reassigned from Judge Christensen. A hearing on the motions was conducted July 17, 2018.

## SUMMARY CONCLUSION

Plaintiffs assert a number of challenges to the Designation, the Project, and the Clean Up Amendment. Plaintiffs' arguments boil down to objections to Forest Service policy and granular attacks on Forest Service science. Defendants rebut that their actions in these three areas were neither arbitrary and capricious nor contrary to law. Defendants prevail.

## LEGAL STANDARDS

### I.   APA

ESA, NEPA, and NFMA claims are reviewed under the Administrative Procedures Act ("APA"), which states that a court "shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a); *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002) (NEPA and NFMA); *Arizona Cattle Growers' Ass'n. v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1235 (9th Cir. 2001) (ESA). Because HFRA includes no private right of action, agency actions under HFRA are also reviewed under the APA. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005) ("Because NFMA and NEPA do not provide a private cause of

8

action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the [APA]."). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). "[J]udicial review of an agency's interpretation of its own regulations is limited to ensuring that the agency's interpretation is not plainly erroneous or inconsistent with the regulation." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003).

## II. NEPA

Regarding the "threshold question of NEPA applicability," "the less deferential standard of 'reasonableness' applies to threshold agency decisions that certain activities are not subject to NEPA's procedures." *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998).

NEPA requires agencies to take a "hard look" at the potential environmental consequences of contemplated actions before making final decisions to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350. (1989). "Although these procedures are almost certain to affect the agency's substantive

9

decision ... NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.* The "hard look" under NEPA may require the preparation of an EIS. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11. To determine whether an EIS is necessary, an agency may prepare an EA. 40 C.F.R. §§ 1501.4(b),(c), 1508.9. If preparation of an EA shows the impacts of the contemplated action will not be significant, the agency may issue a Finding of No Significant Impact ("FONSI"). *Id.* at §§ 1501.4(e), 1508.13.

An agency may also promulgate categorical exclusions from NEPA review for actions "which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. If a proposed action falls within a categorical exclusion, the agency is not required to prepare an EA or EIS. *Id.* "An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1446 n.5 (9th Cir. 1996) (*as amended* June 17, 1996).

### III. NFMA

"NFMA creates a two-step process for the management of our national forests." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005). The Forest Service "must first develop a Land Resource

10

Management Plan ("Forest Plan") for each unit of the National Forest System." *Id.* (citing 16 U.S.C. § 1604(f)(1)). Next, the Forest Service must ensure that individual projects within a forest unit are "consistent with each forest's overall management plan." *Id.* (citing 16 U.S.C. § 1604(i)).

## IV.   HFRA

HFRA "directs the Forest Service to take action to 'reduce wildfire risk' and 'enhance efforts to protect watersheds and address threats to forest and rangeland health.'" *WildWest Inst. v. Bull*, 547 F.3d 1162, 1165 (9th Cir. 2008) (quoting 16 U.S.C. § 6501(1), (3)). "Specifically, the Forest Service is required 'as soon as practicable' to implement an 'authorized hazardous fuel reduction project' on federal land where 'the existence of an epidemic of disease or insects, or the presence of such an epidemic on immediately adjacent land and the imminent risk it will spread, poses a significant threat to an ecosystem component, or forest or rangeland resource.'" *Id.* (quoting 16 U.S.C. § 6512(a)(4)) (alterations omitted). HFRA requires NEPA compliance. *Id.* (citing 16 U.S.C. § 6514(a)).

## V.   ESA

Finally, the ESA requires federal agencies to ensure that "any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C.

§ 1536(a)(2). The ESA "imposes on all agencies a duty to consult with either Fish and Wildlife Service or the NOAA Fisheries Service before engaging in any discretionary action that may affect a listed species or critical habitat." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012).[5] If the agencies determine the proposed action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated and no further action is necessary. 50 C.F.R. §§ 402.13(a), 402.14(b)(1). If it is determined that the action is "likely to adversely affect" listed species or designated critical habitat, however, the agencies must then engage in formal consultation, *id.* at §§ 402.13(a), 402.14(a)–(b), and the consulting agency must issue a Biological Opinion assessing the likelihood of "jeopardy" to the species and "destruction or adverse modification" of its critical habitat, *id.* at § 402.14(g),(h).

**ANALYSIS**

## I.    Motions to Strike and Supplement

---

[5] In 2018, Congress amended NFMA to provide that consultation is no longer required "if a land management plan has been adopted by the Secretary as of the date of listing or designation." 16 U.S.C. § 1604(d)(2)(A)(i). However, consultation is still required if (1) 15 years have passed since the forest plan was adopted and (2) either five years have passed since the date of the amendment (March 23, 2018) or since the date of the listing of a threatened or endangered species known to occur on the unit, or designation of critical habitat within the unit. *Id.* at § 1604(d)(2)(B)(i),(ii). Because this provision was enacted after the actions at issue in this case, it does not apply. Further, assuming it did apply, the Gallatin Forest Plan was adopted in 1987, and the Canada lynx listed as threatened in 2000.

Defendants seek to strike four declarations Plaintiffs filed with the

Complaint. In turn, Plaintiffs seek to supplement the record with two additional

declarations. Because Plaintiffs base much of their substantive argument on the

supplemental declarations, their preliminary consideration is appropriate. The

motion to strike is granted, and the motion to supplement is denied.

### A.    Motion to Strike

The motion to strike concerns four declarations attached to the Complaint:

three are from Sara Jane Johnson, Ph.D., a wildlife biologist, (Docs. 1-2, 1-3, 1-4),

and the fourth is from Jeff Juel, a former school psychologist with an M.S. in

School Psychology, (Doc. 1-5). These declarations total approximately 134 pages,

and cover the following topics:

> **First Johnson Declaration (36 pages)**: elk security calculations in the
> Project area, and big game hiding cover requirements in the Amended
> Gallatin Forest Plan.
> **Second Johnson Declaration (35 pages)**: the effect of the Project on lynx
> habitat connectivity.
> **Third Johnson Declaration (46 pages)**: snag management analysis in the
> Project area, the effects on old growth levels of the Clean Up Amendment,
> and management indicator species in the Project area.
> **Jeff Juel Declaration (17 pages)**: the Forest Service's analysis of soil
> productivity standards in the Project area.

Defendants argue the declarations attack the Forest Service's scientific

methodology, creating an impermissible "battle of the experts." (Doc. 30 at 3.)

Plaintiffs insist that the declarations may be considered because they merely

"buttress Plaintiffs' claims with detailed background, factual statements, and

13

explanation of scientific principles and studies referenced in their comments to the agencies in the administrative process." (Doc. 33 at 2.) Defendants have the better argument.

"Generally, judicial review of an agency decision is limited to the administrative record on which the agency based the challenged decision." *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). That limitation "ensures that the reviewing court affords sufficient deference to the agency's action. The APA gives an agency substantial discretion 'to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *San Luis & Delta–Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)). "Extra-record declarations by scientists are of heightened concern as they implicate the deference due the agency and essentially lead to de novo review of the agency's action rather than the more deferential review required by the APA." *Native Ecosystems Council v. Weldon*, 232 F. Supp. 3d 1142, 1148 (D. Mont. 2017) (citing *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)); *see also Mississippi v. EPA*, 744 F.3d 1334, 1348 (D.C. Cir. 2013) ("We repeat: it is not our job to referee battles among experts; ours is only to evaluate the rationality of [the agency's] decision . . . . ").

However, "expansion of the administrative record" is allowed where: "(1)

14

supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency." *Fence Creek*, 602 F.3d at 1131. The exceptions are "narrowly construed," and it is the proponent's "heavy burden to show that the additional materials sought are necessary to adequately review" the agency decisions at issue here. *Id.*

Plaintiffs' general argument is that the declarations (1) show the Forest Service did not consider all relevant factors and (2) explain technical terms and complex subjects. To that end, many of the paragraphs in the declarations include notations indicating which exception to the extra-record evidence bar Plaintiffs believe applies. Despite this coding, review of the declarations show that they attempt to improperly stage a battle of the experts.

All three of the Johnson declarations go beyond the limitations on extra-record evidence by attacking the science underlying the Forest Service's decisions. In her first declaration, Johnson attacks the methodology by which the Forest Service manages elk security and hiding cover; in her second declaration, she attacks the science underlying the Forest Service's treatment of lynx habitat; and in her third declaration, she attacks the treatment of snag habitat in the Gallatin Forest Plan. While the declarations purport to be limited to extra-record exclusions, in

substance they target the Forest Service's science. Their consideration would therefore lead to de novo review of the decisions at issue here by inviting judicial weighing of the science.

The same applies for Juel's declaration, which targets the Forest Service's soil productivity analysis of the Smith Shields Project. Contrary to Plaintiffs' assertion, the declaration does not simply explain complex terminology or provide relevant background, but assails the methodology itself. Further, even if attacks on the science were within the Court's purview, it is not clear that Juel, a school psychologist by trade and training, possesses scientific expertise about soil productivity standards. In sum, neither the relevant factors exception nor the technical terms/complex subject matter exceptions apply to the Johnson and Juel declarations.

Plaintiffs also argue the declarations may be considered because, with regard to the Designation, Plaintiffs are attempting to compel agency action—namely, to compel the Forest Service to conduct an EIS considering the impacts of the designation. Section 706(1) of the APA applies where a plaintiff seeks to "compel agency action unlawfully withheld or unreasonably delayed." "In such cases, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). Therefore,

Plaintiffs insist, the declarations may be considered with regard to the Designation.

While Plaintiffs are correct that the declarations would be available for consideration in a § 706(1) action, that is not the case Plaintiffs pled here. The Complaint requests the Designation be set aside "pursuant to 5 U.S.C. § *706(2)(A)* and 16 U.S.C. § 1540(g) [ESA]." (Doc. 3 at ¶ 4) (emphasis added). Plaintiffs' argument is also a red herring because the Johnson and Juel declarations do not target the Designation. Instead, they focus on the Project and the Amendment. And as discussed in Section II(A), *infra*, the Forest Service's decision to designate the lands in Montana was not a final agency action requiring NEPA review. Plaintiff's argument that § 706(1) applies to the declarations is misplaced.

Finally, Plaintiffs assert that the nature of this case calls for a more relaxed approach to extra-record evidence. Specifically, Plaintiffs insist that because neither the HFRA designation, the Amendment, nor the Project involved an EIS, the opportunity for public involvement was limited and the record should be expanded. Plaintiffs cite no authority for this argument, and, as Defendants point out, courts in the Ninth Circuit have applied the extra-record bar when considering an EIS, *Nw. Envt. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1132 (9th Cir. 2006), an EA, *Nat. Res. Def. Council v. Duvall*, 777 F. Supp. 1533, 1538 (E.D. Cal. 1991), and categorical exclusions, *W. Watersheds v. U.S. Forest Serv.*, 2012 WL 1094356, at *7 (N.D. Cal. Mar. 30, 2012). The record also cuts against

17

Plaintiffs argument, as (1) the Forest Service's approval of the Amendment

involved an EA, with concomitant public input, CleanUp 000774, 000910 (Native

Ecosystems Council comments), and (2) the decision to approve the Smith Shields

Project involved a scoping process with public input, SmithShields 014416–18.[6]

Indeed, the law requires agencies to respond to scientific concerns and

studies raised by the public. *See Anderson v. Evans*, 314 F.3d 1006, 1016 (9th Cir.

2002) ("The public must be given an opportunity to comment on draft EAs and

EISs, and public hearings are encouraged to facilitate input on the evaluation of

proposed actions. *See* 40 C.F.R. §1503.1, 1506.6.") Council on Environmental

Quality regulations require an agency to "involve . . . the public, to the extent

practicable, in preparing [EAs]." 40 C.F.R. § 1501.4(b). Forest Service

regulations also require public input when the Forest Service prepares an EA. 36

C.F.R. §§ 218.22, 218.24. Nor does the application of the categorical exclusion to

the Project mean the public is shut out, as the 2014 Farm Bill requires "public

notice and scoping for any project or action proposed in accordance with this

section." 16 U.S.C. § 6591b(f). "Application of a categorical exclusion is not an

exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that

---

[6] At the July 17 hearing, Plaintiffs' counsel asserted for the first time that the four
declarations have already been included in the record. However, the citation
provided merely contains scanned copies of the Complaint and the four
declarations filed in this case, which were not part of the record before the FS
when it made its decision. *See* SmithShields 014551–014684.

18

requires less than where an [EIS] or an [EA] is necessary." *Ctr. for Bio. Div. v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013).

The declarations will not be considered in evaluating the motions for summary judgment. However, the Johnson declarations are intended to support standing for Native Ecosystems Council. (*See, e.g.*, Doc. 1-2 at ¶¶ 3–6) (Johnson stating she is Executive Director of Native Ecosystems council and has visited, and plans to return to, the Project area), and Defendants do not object to their use for that purpose. Accordingly, the motion to strike is granted except as to those portions of the Johnson declarations supporting standing.

**B. Motion to Supplement**

In addition to the four declarations at issue in Defendants' motion to strike, Plaintiffs have filed a motion to supplement the record with two further declarations—Johnson's fourth declaration, and a declaration from William Haskins. Haskins is an information technology specialist; his declaration involves an overlay of two maps—the cutting unit map for the Smith Shields Project decision memo, and a 2006 "Successional Stages Smith Creek Vegetation" map from the Smith Creek Project. (Doc. 38-1.) Johnson's fourth declaration deals with old growth forest in the Smith Shields Project area. Plaintiffs assert the two declarations "support allegations of bad faith on the part of the Forest Service in approving Smith Shields," and "explain technical terms or complex subjects for the

Court in order to understand those allegations," (Doc. 38 at 3), but have not submitted a brief in support of their motion to supplement. The motion is denied.

First, the motion is untimely. The Case Management Order required Plaintiffs to raise "any and all issues relating to the sufficiency of the agencies' administrative records" by July 28, 2017. (Doc. 8 at 2.) It also set August 28, 2017, as the deadline for motions to supplement or challenge the administrative record. (*Id.*) Plaintiffs failed to raise the declarations at issue with Defendants by July 28, 2017, and filed their motion to supplement on October 27, 2017, two months past the deadline. Plaintiffs make no argument to excuse the late-filing.

Second, and as with the four declarations at issue in Defendants' motion to strike, the two declarations do not fit within the four "narrowly construed" circumstances permitting extra-record evidence. *See Fence Creek*, 602 F.3d at 1131. Johnson's fourth declaration disputes the scientific and technical methods employed by the Forest Service in conducting tree stand exams. The point of Haskin's declaration seems to be that the overlay map shows the Forest Service included old growth in Smith Shield Project harvest areas, but the Forest Service did not rely on the 2006 Smith Creek map when analyzing old growth in the Smith Shield Project area, but instead used on-the-ground inspection by a silviculturist. SmithShields 001868–9. In other words, the Haskins declaration attacks the Forest Service's methodology. Even had the declarations been timely filed, they still

would not merit consideration. The motion to supplement is denied.

## II.    Summary Judgment

Plaintiffs' briefing blurs the line between the claims they support and the decisions they challenge. In brief, Plaintiffs argue that (1) the Forest Service Chief's Designation triggered NEPA; (2) the Forest Service did not sufficiently consider potential impacts from the Amendment or the Project on the Canada lynx; (3) the Amendment involved substantial changes to two forest-wide standards that required preparation of an EIS, as demonstrated by impacts from the Project; and (4) the Project violates HFRA because it does not maximize old growth retention and comply with soil productivity standards. Plaintiffs' arguments are not persuasive.

### A.  Designation

Plaintiffs argue that Forest Service Chief Tidwell's designation of 4,955,159 acres as threatened landscapes in Montana was a major federal action that should have triggered NEPA review. Defendants respond that the Designation was not a final agency action, meaning that NEPA was not implicated. Defendants have the better argument.

"NEPA requires federal agencies to prepare an EIS for 'every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.'" *Northcoast*,

21

136 F.3d at 668 (quoting 42 U.S.C. § 4332[](C)). "However, NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on a proposed project." *Id.* Instead, "an EIS is required at the point when a federal agency makes an 'irreversible and irretrievable commitment of the availability of resources.'" *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) (quoting *Envtl. Def. Fund, Inc. v. Andrus*, 596 F.2d 848, 852 (9th Cir. 1979)).

To determine whether the Designation constituted a final agency action, it is important to understand the statutory framework governing designations. The 2014 Farm Bill outlines a two-step process for expediting treatment of insect-infested and diseased forests. First, the Forest Service may designate "landscape scale areas" if those areas are:

> (1) experiencing declining forest health, based on annual forest health surveys conducted by the Secretary;
> (2) at risk of experiencing substantial tree mortality over the next 15 years due to insect or disease infestation, based on the most recent National Insect and Disease Risk Map published by the Forest Service; or
> (3) in an area in which the risk of hazard trees poses an imminent risk to public infrastructure, health, or safety.

16 U.S.C. § 6591a(c). Once that designation has occurred, "[t]he Secretary may carry out priority projects on Federal land in the [designated area] to reduce the risk or extent of, or increase the resilience to, insect or disease infestation in the areas." *Id.* at § 1691a(d)(1). Certain projects may, in turn, be categorically

22

excluded from NEPA review pursuant to 16 U.S.C. § 6591b. To be categorically excluded, projects must "maximize[] the retention of old-growth and large trees," "consider[] the best available scientific information to maintain or restore the ecological integrity," and "be developed and implemented through a collaborative process." 16 U.S.C. § 6591b(b)(1). Such projects "may not exceed 3000 acres," are limited to "the wildland-urban interface" or areas of heightened wildfire threat, and may not include new roads. *Id.* at § 6591b(c)(2)-(3).

The Designation is not a final agency action. First, it does not involve an "irreversible and irretrievable commitment of the availability of resources." *Friends of Southeast's Future*, 153 F.3d at 1063. While the Designation makes significant portions of National Forest land within Montana subject to small-scale projects to reduce insect infestation and disease, it does not itself authorize individual projects. As discussed above, significant procedural hurdles still remain, and each project remains subject to NEPA challenge, as this case demonstrates.

Second, the nature and extent of those projects is, at this point, speculative. Accordingly, NEPA review at the designation stage would not provide any meaningful results, as the extent of the projects is unclear. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ("Where the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of

reason worthy of that title would require an agency to prepare an EIS.'") In other words, "the area designation has only potential or contingent effects on the environment, to which NEPA does not apply." *Ctr. for Biological Diversity v. Illano*, 261 F. Supp. 3d 1063, 1066 (E.D. Cal. 2017).

Because future projects were hypothetical and the Forest Service made no commitment of resources, the Designation did not require an EIS.

## B. Lynx Issues

Plaintiffs further assert the Designation and the Project both "pose unacceptable, and largely unexamined, threats to connectivity of habitat for the threatened Canada lynx." (Doc. 13 at 9.) They argue that (1) the agencies violated HFRA because they failed to consider the best available science to maintain or restore habitat connectivity; (2) the Project poses potential significant impacts requiring the preparation of an EA; and (3) the Forest Service violated NEPA by informally amending the Lynx Amendment without public involvement. Plaintiffs' arguments are not compelling.

### 1. Lynx Habitat Connectivity

Plaintiffs argue Defendants ignored the findings of Squires *et al.*, which they claim is the current best science on lynx connectivity. HFRA mandates consideration of "the best available scientific information to maintain or restore the ecological integrity, including maintaining or restoring structure, function,

24

composition, and connectivity." 16 U.S.C. § 6591b(b)(1)(B). The Forest Service

consulted with the Fish and Wildlife Service regarding the Project's effects on

federally listed threatened and endangered species. SmithShieldsFWS 000001.

The Fish and Wildlife Service determined that the Project "may affect—not likely

to adversely affect [sic]" Canada lynx, and that it would have "no effect" on

designated critical habitat for Canada lynx. *Id.* at 000004–5. There is no lynx

critical habitat in the Crazy Mountains. SmithShields 002696.

Lynx analysis units "are areas delineated across a landscape with sufficient

lynx habitat, based on a conceptual framework meant to approximate the size of an

adult female lynx home range. The Crazy Mountains include 2 [units], one on

each side of the east-west divide." SmithShieldsFWS 000024. "All of the

proposed treatment units (1,668 acres) occur within the West Crazies [Unit]." *Id.*

at 000022. "The lynx habitat present in the [Project] area is classified as both

unoccupied and secondary lynx habitat, indicating is has minimal value for lynx

other than for dispersing or transient individuals." *Id.* at 00004.

Contrary to Plaintiffs' assertion, the Fish and Wildlife Service considered

habitat connectivity. *Id.* at 000002, 000030–34. Specifically, the Service

considered Objective ALL 01 of the Northern Rockies Lynx Management

Direction, which requires "maintain[ing] or restor[ing] lynx habitat connectivity in

and between [lynx analysis units], and in linkage areas." *Id.* at 000030. In

addition, Squires *et al.* is included in the Service's administrative record for its

Biological Assessment of the Project, *id.* at 000194, and the Assessment concludes

that "[n]ew science relevant for conservation of Canada lynx in the Northern

Rockies is consistent with conservation measures in the [Lynx Conservation

Assessment and Strategy] and management direction in the [Northern Rockies

Lynx Management Direction.]" *Id.* at 000034. That conclusion includes a citation

to Squires *et al.*

Finally, to the extent Plaintiffs rely on Squires *et al.* to argue that the Fish

and Wildlife Service ignored the best available science, their dispute goes to the

interpretation of Squires *et al.*, which is precisely the agency's area of expertise.

*See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir.

2014) ("Where the agency has relied on relevant evidence such that a reasonable

mind might accept as adequate to support a conclusion, its decision is supported by

substantial evidence. Even if the evidence is susceptible of more than one rational

interpretation, the court must uphold the agency's findings.") (internal quotations,

citations, and alterations omitted). Defendants did not ignore the best available

science.

## 2. **Uncertainty Does Not Require an EA**

In addition to their HFRA argument, Plaintiffs allege Defendants violated

NEPA because "uncertainty concerning impacts on putative corridors for lynx

26

should have precluded categorical exclusion." (Doc. 13 at 13.) They insist an EA is necessary. Forest Service categorical exclusion regulations require preparation of an EA "[i]f the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment." 36 C.F.R. § 220.6(c).

Plaintiffs once again rely on Squires *et al.* for much of their argument, insisting that the agencies ignored its science in determining that an EA was unnecessary. But, as discussed above, "[e]ven if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings." *San Luis & Delta-Mendota*, 747 F.3d at 601 (internal quotation and alteration omitted). And, the Biological Assessment considered connectivity, concluding the Project would retain connectivity because (1) it would impact a small amount of lynx habitat, (2) impacts to winter snowshoe hare habitat would be isolated and temporary, (3) the natural mosaic of young to old tree stands would be maintained, and (4) location of the treatments retaining vegetation cover in the Lynx Analysis Unit would allow for lynx mobility. SmithShields 002702, 002705–06, 002709. The Fish and Wildlife Service concluded the Project "would maintain connectivity, allowing transient lynx to move through the area," and that "[t]reatments are not expected to preclude any future use of the area by transient lynx." SmithShields 002677. That conclusions was not arbitrary and capricious.

### 3. Amended Lynx Amendment

Finally, Plaintiffs argue the Lynx Amendment has been altered by the 2013 Lynx Conservation Assessment and Strategy without public involvement or Forest Plan amendment, which has downgraded the conservation value of unoccupied secondary habitat.

The Northern Rockies Lynx Management Direction ("Lynx Amendment") amended the forest plans of 18 National Forests within the Rocky Mountain, Intermountain, and Northern Regions of the Forest Service, including the Gallatin National Forest, to add specific objectives, standards, and guidelines for management of lynx habitat. SmithShields 002695. It incorporates conservation measures from the 2000 Lynx Conservation Assessment and Strategy. *Id.* The Strategy was revised in 2013, and that revision "stratifie[d] the objectives and conservation measures by core areas and secondary/peripheral areas to help managers prioritize their conservation efforts." *Id.* Plaintiffs attack the effect of the 2013 revision on the Lynx Amendment, but simply claiming that the revision downgraded lynx protection does not, without further support, make it so. Plaintiffs' argument that the Forest Service downgraded lynx protection is further undercut by the fact that, even though the Lynx Amendment "only applies to occupied lynx habitat," SmithShields 002695, the Forest Service applied it to the Project anyway, *id.* at 002705.

## C. Clean Up Amendment

NFMA requires the Forest Service develop and maintain a Forest Plan for each unit of the National Forest System. 16 U.S.C. § 1604(a). The Gallatin Forest Plan was created in 1987, following an EIS. It was amended in November 2015 (the "Clean Up Amendment"), following an EA, "remov[ing] or modify[ing] 56 goals and standards." CleanUp 000324. Plaintiffs argue that amendment triggered "significant environmental concerns over the cumulative impacts of timber harvest under the forest plan on wildlife diversity in the Gallatin," and that "a supplement to the Gallatin Plan EIS is required under NEPA." (Doc. 13 at 16.) Specifically, Plaintiffs target Amended Standard 6(a)(5), pertaining to big game hiding cover, and Amended Standard 6(c)(2), pertaining to old growth.

### 1. Amended Standard 6(a)(5) (Hiding Cover)

Plaintiffs argue that, "[r]ather than merely clarifying the 'original intent' of the Gallatin [Forest] Plan," Amended Standard 6(a)(5) removes the standard altogether and should have triggered preparation of an EIS. (*Id.* at 18.) Defendants rebut that Plaintiffs failed to exhaust the issues they raise, and that the Forest Service's actions were not unlawful.

### a. Exhaustion

As an initial matter, Defendants assert that Plaintiffs failed to administratively exhaust their claims because they did not object to the

Amendment in terms of elk security and elk displacement. Plaintiffs respond that "the issue was sufficiently raised in the administrative process to afford the Forest Service the opportunity to address it by preparing a more thorough EIS." (Doc. 37 at 24.)

"The APA requires that plaintiffs exhaust available administrative remedies before bringing grievances to federal court. . . ." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846 (9th Cir. 2013). "Plaintiffs need not frame issues in precise legal formulations, so long as the appeal, taken as a whole, provides sufficient notice to the Forest Service to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Id.* (internal quotations and alterations omitted). However, "claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Id.* at 846–47 (internal quotations omitted).

In its comments, Native Ecosystems stated that "[e]limination of the requirement to maintain 2/3rds [sic] hiding cover associated with key habitat components over time, as well as eliminating the requirement to map hiding cover, certainly will not improve the management or analysis of timber harvest impacts on big game. The point of this amendment appears to simply eliminate troublesome elk habitat standards that interfere with timber harvest." CleanUp

000911. Native Ecosystems also commented that the Forest Service failed to respond to its concern with "[t]he problem that exists with the current Forest Plan definition of hiding cover." CleanUp 005530. It also asserted that "using a 40% canopy cover as the new definition of hiding cover is not based on any peer-reviewed science, in violation of the NFMA and the NEPA." *Id.*

While Native Ecosystems' comments are not particularly precise, they do provide notice to the Forest Service that the big game hiding cover standard was at issue. They also specifically identified elk habitat standards as an issue of concern. Plaintiffs adequately exhausted their claims regarding elk security and elk displacement.

### b. Substantive Issues

Plaintiffs argue the Forest Service (1) did not consider the best available science when amending Standard 6(a)(5); (2) substantively changed the standard without sufficient analysis; and (3) diminished elk security protection. Defendants, who disagree on all three points, have the better argument.

Pre-Amendment Standard 6(a)(5) provided:

> Maintain at least two thirds of the hiding cover associated with key habitat components over time. Subsequent timber sale activity will be allowed after regeneration provides hiding cover. Key habitat components are important features for wildlife. They include moist areas (wallows etc.); foraging areas (meadows and parks); critical hiding cover (see Glossary in Chapter VI for definition); thermal cover; migration routes, and staging areas. These areas will be mapped on a site-by-site basis during project area analysis.

Amended Standard 6(a)(5) in turn provides:

Vegetation treatment projects (e.g. timber harvest, thinning and prescribed burning) shall maintain at least two-thirds (2/3) of Douglas fir, lodgepole pine, and subalpine fir conifer forest cover types (on National Forest System lands), with at least 40% canopy cover (on National Forest System lands), to function as hiding cover for elk at any point in time. Hiding cover will be assessed for an elk analysis unit (EAU) which is based on a collaborative mapping effort between the local state (MDFWP) wildlife biologist and the local Forest Service wildlife biologist. In designing vegetation treatment projects protect the integrity of key habitat components, such as wallows or moist meadows, through project design or mitigation (e.g. no cut buffers).

### i. Best Available Science

Plaintiffs argue Amended Standard 6(a)(5) is not based on the best available science because it ignores Canfield *et al.* and Lyon *et al.* ("Final Report of the Montana Cooperative Elk-Logging Study 1970–1985" by the Montana Department of Fish, Wildlife, and Parks). Defendants respond that the Forest Service used the best available science by following the recommendations from a report entitled "Collaborative Overview and Recommendations for Elk Habitat Management on the Custer, Gallatin, Helena, and Lewis & Clark National Forests" ("Collaborative Recommendations") prepared by the Forest Service and the Montana Department of Fish, Wildlife, and Parks in 2013. CleanUp 003972. Although Plaintiffs' briefing does not so specify, this argument is apparently being advanced as a

32

NFMA violation.[7] Under NFMA, Forest Service regulations require use of "the best available scientific information to inform the planning process . . . for . . . developing, amending, or revising a plan." 36 C.F.R. § 219.3.

As Defendants point out, the Collaborative Recommendations includes significant review of research on elk security and how it applies in western Montana. That includes review of Hillis *et al.* 1991, Christensen *et al.* 1993, Proffitt *et al.* 2013, and Canfield *et al.* 2011, and a significant number of other articles. CleanUp 003983–92, 003998–4002. "Where the agency has relied on relevant evidence such that a reasonable mind might accept as adequate to support a conclusion, its decision is supported by substantial evidence." *San Luis & Delta-Mendota*, 747 F.3d at 601 (internal quotations and alteration omitted). When the analysis of an agency decision "requires a high level of technical expertise," the court "must defer to the informed discretion of the responsible federal agencies." *Selkirk Conservation Alliance v. Fosgren*, 336 F.3d 944, 954 (9th Cir. 2003) (quoting *Marsh*, 490 U.S. at 377).

Plaintiffs object that the Collaborative Recommendations was neither published nor subject to peer review, but point to no requirement that the Forest Service's internal review of the scientific evidence itself be peer reviewed.

_____

[7] NEPA does not have a "best available science requirement," but rather its implementing regulations demand information of "high quality" and professional and scientific integrity. 40 C.F.R §§ 1500.1, 1502.24

33

Somewhat confusingly, Plaintiffs then mount a NEPA attack, charging that the Forest Service may not "tier" to the Collaborative Recommendations. (Doc. 37 at 16); *see* 40 C.F.R. But NEPA does not contain a best science requirement, *see supra* n.7, and the gravamen of Plaintiffs' argument is that the Forest Service ignored best science when amending Standard 6(a)(5). The Forest Service did not ignore the best available science.

### ii. Substantive Change to 6(a)(5)

Plaintiffs also argue that the Forest Service substantively changed Standard 6(a)(5) by removing the two-thirds hiding cover standard and replacing it with the requirement that vegetation treatment projects "shall maintain at least two-thirds (2/3) of Douglas fir, lodgepole pine, and subalpine conifer forest cover types (on National Forest System lands) with at least 40% canopy cover (on National Forest System lands), to function as hiding cover for elk at any point in time." CleanUp 000740–41. More precisely, Plaintiffs argue that the two thirds hiding cover requirement used to apply at the Elk Herd Unit level and that amending the standard reduced its scope in four ways: (1) it applies only to National Forest lands, rather than the total area of the relevant landscape; (2) it applies only to forested areas, rather than all National Forest lands; (3) it applies only to certain types of forests, rather than total forested areas; and (4) it presumes that any forest with 40% canopy cover will function as hiding cover. Defendants disagree,

34

arguing that, prior to amendment, 6(a)(5)'s two thirds hiding cover requirement

was not correlated to any particular total area, but required only that two-thirds of

hiding cover be retained. They also insist that, in any case, the best available

science does not require two-thirds of the area in every Elk Herd Unit to be hiding

cover.

As to Plaintiffs' best available science argument, where interpretation of

scientific literature is at issue, courts must provide a high degree of deference. *See*

*Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008), *overruled on other*

*grounds, Winter v. Am. Trucking Ass'ns Inc. v. City of L.A.*, 559 F.3d 1046, 1052

(9th Cir. 2009) (discussing the "particularly deferential review" required when

courts examine agency science). The Collaborative Recommendations, upon

which the Forest Service relied, stated as follows regarding whether hiding cover

should be assessed at any particular spatial scale:

> We concluded that a specific quantifiable cover recommendation was
> not supported by the scientific literature. While Lyon et al. 1985
> (Coordinating Elk and Timber Mangement; 1985) speaks to "good
> cover" as being two-thirds of the total area, and Thomas et al. (1979)
> recommended managing for 40% cover and 60% forage for elk, to our
> collective knowledge, these recommendations have never been
> empirically tested. Blocks of forested cover were not a strong predictor
> of elk distribution in a recent study in Montana (Proffitt et al. 2012).

CleanUp 003991. The Forest Service's interpretation of the hiding cover literature

survives that deferential standard. Plaintiffs rely heavily on a statement in Lyon *et*

*al.* that "cover is poor" at "one-third or less of total area," and "good" at "at least

35

two-thirds of total area." (Doc. 13 at 19–20); SmithShields 007099. But that citation does not define "total area."

Plaintiffs also rely on two cases for the proposition that the Elk Herd Unit scale has been recognized in the Ninth Circuit as the best available science: *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 962 (9th Cir. 2005), and *Helena Hunters & Anglers v. Tidwell*, 841 F. Supp. 2d 1129, 1142 (D. Mont. 2009). Both cases addressed whether the Forest Service had complied with the hiding cover requirement in the Helena National Forest Plan, but did not conclude two thirds cover was the best available science. The issue here is whether the Forest Service relied on the best available science.

As to the diminished hiding cover argument, Plaintiffs first argue elk habitat protection has been diminished because the amended standard applies only to National Forest lands, rather than to the total area of the relevant landscape, such as an Elk Herd Analysis Unit. Plaintiffs rely on *Native Ecosystems Council v. Weldon*, a case from this Court which held that the Forest Service acted arbitrarily by excluding private lands from two units of analysis involved in a landscape management project in the Custer National Forest. 848 F. Supp. 2d 1207, 1217–18 (D. Mont. 2012), *vacated for mootness by Native Ecosystems Council v. Weldon*, 2012 WL 5986475 (D. Mont. 2012). But that case dealt with project-level analysis under a Forest Plan, while Plaintiffs challenge here concerns amendment of a

Forest Plan. The pre-amendment standard did not specify that it pertained to any specific "total area." Instead, it linked the two-thirds hiding cover requirement to "key habitat components," including "moist areas (wallows etc.); foraging areas (meadows and parks); critical hiding cover . . . thermal cover; migration routes, and staging areas," and stated that such areas "will be mapped on a site-by-site basis during project area analysis." CleanUp 000354. And, as Defendants note, before amendment, hiding cover was determined using the Timber Stand Management Record System, which has data for National Forest System lands, but not for non-federal lands. SmithShields 003523, 003526.[8]

Second, Plaintiffs assert the amended standard reduces hiding cover protection because it applies only to forested areas in National Forest lands, and not to all areas. Again, Plaintiffs' argument overlooks how the pre-amendment standard connected the two thirds hiding cover requirement with "key habitat components." CleanUp 000354. And, risking tautology, hiding cover can only be protected where it exists (or could exist). Hiding cover is "vegetation capable of concealing 90% of a standing big game animal at a distance equal to or less than 200 feet." SmithShields 003514. Accordingly, maintaining that cover can only

---

[8] Plaintiffs argue that the two thirds standard was intended to apply to the total area of any considered project. But that argument does not take into account that not all project areas will be elk security habitat. For example, if only 25% of a project area had hiding cover, it would be impossible to maintain two thirds of the total area of that project as hiding cover.

apply to areas capable of providing it.

Third, Plaintiffs argue the amended standard reduces hiding cover protections because it pertains only to "douglas fir, lodgepole pine, and subalpine fir conifer forest cover types . . . with at least 40% canopy cover." CleanUp 000354. But, as Defendants note, the tree species or mixes of species that provide hiding cover are those "naturally capable of having relatively dense (>=40%) canopy cover and could include Douglas fir, subalpine fir, spruce, and lodgepole pine." CleanUp 003991 (Collaborative Recommendations). The amended standard is therefore more precise, but does not provide less protection.

Fourth, Plaintiffs insist that using 40% canopy cover as a proxy for the Gallatin Forest Plan definition of hiding cover contravenes the best available science for measuring hiding cover. But the Collaborative Recommendations concluded that 40% cover types "will generally provide screening for animals and be capable of hiding 90% of an elk <= 200'." CleanUp 003391. The Ninth Circuit has upheld the use of canopy cover as proxy for hiding cover, noting that the court is "required to apply the highest level of deference in [its] review of the Forest Service's scientific judgments in selecting the elk hiding cover methodology." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012). "The mere fact that Native Ecosystems Council disagrees with the methodology does not constitute a NEPA violation." *Id.*

### iii. Smith Shields Project Elk Security and Displacement

Plaintiffs argue that application of Amended Standard 6(a)(5) to the Project shows that it reduces elk security and exacerbates elk displacement by significantly reducing the required amount of hiding cover. Plaintiffs focus on a table from the Smith Shields Wildlife Report ("Wildlife Report") which shows 30,375 acres of total existing and potential hiding cover on a total of 86,903 acres of National Forest system and private lands within four 6th code Hydrologic Unit Codes.[9] SmithShields 002614. Because 30,375 is just under 35% of the total area, but the Forest Service nevertheless found the Project met Amended Standard 6(a)(5), Plaintiffs insist that the change to 6(a)(5) was substantial. But, as Defendants note, Plaintiffs' argument is predicated on the conclusion that pre-amendment hiding cover standard required that two-thirds of any analysis unit be elk hiding cover, not that two-thirds of the existing hiding cover be maintained. As discussed above, that conclusion misreads the standard.

Plaintiffs further assert that the amended standard allows almost unlimited logging of hiding cover without any cumulative effects because it provides no time for logged areas to recover their habitat values for wildlife. But the Wildlife

---

[9] A hydrologic unit code is, as its name suggests, a watershed-based unit of measurement. The hydrologic unit codes at issue here range in size from 14,577 acres to 31,785 acres. SmithShields 002614.

Report considered both "areas that currently provide hiding cover" and "areas that have potential to provide hiding but have been affected by disturbance" as making up the total acres accounting for hiding cover. SmithShields 002614, 002617. Because the baseline hiding cover includes both disturbed and undisturbed areas, the overall amount of hiding cover cannot be whittled below two thirds. In other words, the denominator in the hiding cover fraction remains the same. In *Hapner v. Tidwell*, the Ninth Circuit found the Forest Service's interpretation of Standard 6(a)(5) (pre-amendment) was plainly erroneous where the Forest Service argued the standard mandated retaining two-thirds of "then-existing" elk cover. 621 F.3d 1239, 1251 (9th Cir. 2010). That decision is not at odds with the conclusion that the amended standard retains two-thirds cover because, as discussed, the baseline measurement includes both disturbed and undisturbed areas.

Plaintiffs next assert that amending Standard 6(a)(5) violated NEPA because the Clean Up Amendment did not address the connection between low elk security and elk displacement, specifically as it pertains to displacement during hunting season. But the record shows Defendants took a "hard look" at that issue. *See Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) (quoting *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1009).

An elk security area is "the area that will, during periods of hunting stress, hold elk because of geography, topography, vegetation, or a combination of these

factors." SmithShields 002612 (Wildlife Report). "Security areas are intended to reduce elk vulnerability during the elk hunting season, and to provide animals the opportunity to meet their biological needs without making large range movements (e.g. to private land where hunting is not allowed or to lower quality habitats)." CleanUp 003984.

First, as Defendants point out, Plaintiffs appear to conflate hiding cover and elk security, though the two are not synonymous. As shown above, vegetation is only one of several factors that may contribute to an elk security area. Second, the Collaborative Recommendations contains an extensive discussion of elk security, and recommends "that the local [Montana Department of Fish Wildlife and Parks] and [Forest Service] wildlife biologists work together to define the numerical parameters (i.e. size of area, distance from roads, percentage of analysis unit, etc.) to be used for determining security areas at the local project level." CleanUp 003983. Thus the amendment decision involved consideration of elk security and the science underlying elk security. The conclusions an agency draws from the science are within its reasonable discretion. *See Lands Council*, 537 F.3d at 993. While Plaintiffs are correct to note that elk displacement is a management concern in Montana, that argument addresses broader policy issues. Further, as discussed above, the amended standard does not reduce hiding cover protection. The Forest Service took a hard look at elk security.

41

Finally, Plaintiffs argue the Smith Shields Project fails to analyze the

cumulative effects of elk displacement from public lands due to reductions in

security "from excessive roading and eliminating hiding cover," and that such

cumulative effect precludes a categorical exclusion. (Doc. 13 at 23.) As to the

first, the Wildlife Report for the Smith Shields Project concludes the Project will

maintain existing elk security areas. SmithShields 002616 ("Elk security areas

were defined in this analysis as those areas that are at least 0.5 mile from an open

motorized route or project road and at least 250 acres in size. . . . The proposed

action would not result in reduction in elk security areas.") Though the Project

will involve construction of 6.2 miles of temporary road, that temporary road will

occur where existing road densities range from 1.1 to greater than two miles per

square mile, SmithShields 002616, meaning they will not be constructed in elk

security habitat. Thirty-seven percent of the Smith Shields Elk Analysis Unit is elk

security habitat (32,246 acres out of 87,107 acres). *Id.* at 002613. Where elk

security areas are not reduced, no cumulative impact on elk security areas can

exist.

As to hiding cover, the Forest Service analyzed Project effects in part on the

basis of elk hiding cover. SmithShields 002616–2617. That analysis "assumed

that all the treatment units will remove hiding cover." *Id.* at 002616. While

Plaintiffs want the Forest Service to analyze elk security as a direct function of

42

hiding cover, they fail to cite scientific support for that assertion. Plaintiffs have

not shown significant effects from elk displacement would preempt categorical

exclusion. *See* 40 C.F.R. § 1508.4.

## 2. Old Growth Standard (Amended Standard 6(c)(2))

### a. Substantive Changes

Plaintiffs also direct their attack at Amended Standard 6(c)(2), which they

argue significantly reduces wildlife protection by changing the scale over which

old growth is measured, requiring an EIS. Defendants rebut that that the amount of

old growth maintained remains the same following amendment, and that the Forest

Service disclosed effects on associated wildlife species, which do not require an

EIS. Defendants again have the better argument.

Prior to the Clean Up Amendment, Standard 6(c)(2) provided as follows:

In order to achieve size and age diversity of vegetation, the Forest will
strive to develop the following successional stages in timber
compartments containing suitable timber:

| Successional Stage | Minimum % of Area |
|---|---|
| Grass-forb | 10 |
| Seedlings | 10 |
| Saplings | 10 |
| Pole | 10 |
| Mature | 10 |
| Old Growth | 10 |

CleanUp 000358.

Following amendment, Standard 6(c)(2) provides: "Use fire and other

management tools to help active vegetation size and age class diversity. In part, to

43

achieve this vegetative diversity, strive to maintain a minimum 10% old growth

forest on lands classified as forested at the mountain range scale." *Id.* As can be

seen, the only change in the standard as it relates to old growth is the scale over

which the percentage is assessed (again, this is a denominator problem): prior to

amendment, the denominator was "timber compartments containing suitable

timber" and now it is "lands classified as forested at the mountain range scale."

But the standard still mandates that the Forest Service "strive" to maintain 10% old

growth, and the Forest Service stated that "[t]he mountain range is the scale

adopted as a standard because of data reliability and it makes logical sense in

assessing habitat diversity across the landscape." CleanUp 000332. It noted that

"[a]ssessing old growth at other scales may be appropriate in certain situations."

(*Id.*)

In the Amendment EA, the Forest Service disclosed the effects of the

amended standard on old growth and associated wildlife species. CleanUp

000422–26. It concluded that the change "would not affect wildlife associated old

growth forest because the standard still . . . maintain[s] at least 10% old growth."

CleanUp 000425. Accordingly, Plaintiffs are wrong when they assert the Forest

Service ignored the issue. Plaintiffs also incorrectly assert that the Forest Service

dropped pine marten and goshawk as Management Indicator Species. (Doc. 13 at

26.) The amended standard actually retains both species. CleanUp 000422,

000425.

The Forest Service's conclusion that an EIS was not necessary was not arbitrary and capricious.

### b. Smith Shields and Amended Standard 6(c)(2).

Plaintiffs also attack the Smith Shields Project in terms of Amended Standard 6(c)(2), arguing the Project shows how the amended standard has degraded old growth protection. Plaintiffs' argument seems to be that the change will allow the Forest Service to calculate old growth as a percentage of forested lands instead of as a percentage of total landscape within a timber compartment. But as a matter of logic, the Forest Service can only "strive to maintain" old growth where it exists, either in "timber compartments containing suitable timber" (old standard) or "on lands classified as forested at the mountain range scale" (amended standard). To require the Forest Service strive for 10% old growth across total area would make no sense where there is no indication that the total area is all forested.

Next, Plaintiffs claim the Project will degrade old growth habitat. However, the Project proposes no harvest or treatment in old growth or potential old growth stands. SmithShields 001885, 014406. Plaintiffs make much of the Forest Service's decision not to prepare a map of old growth in the Project area, but point to no requirement that a map be used. Further, a Forest Service silviculturist

conducted walk-through inspection of each stand, as documented in the Stand Diagnosis reports. SmithShields 001531–674. The Forest Service reasonably concluded the project would not have significant effects. 40 C.F.R. § 1508.4

Plaintiffs also claim NEPA and NFMA violations in the Project analysis of pine marten. First, Plaintiffs assert the Forest Service should have considered a 2016 pine marten study, Moriarty *et al*. But the Forest Service did consider the Moriarty study, SmithShields 0022774, which concerns the Pacific marten, a different species than the American marten that occurs in the Gallatin. SmithShields 002774–2782. It was not unreasonable for the Forest Service to conclude that a study concerning a different species with different habitat was not applicable to the Project. SmithShields 002774.

Next, Plaintiffs somewhat incongruously claim the Forest Service may not use pine marten as a Management Indicator Species because pine marten are absent from the Project area. *See Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010) ("[T]he Forest Service's use of the nonexistent sage grouse as an [Management Indicator Species] to assess the project's impact on all sagebrush species' diversity was flawed."). But, while track and camera surveys indicate pine marten are "relatively rare" in the Crazy Mountains, pine marten are not absent. SmithShields 002627, 012808.

Finally, Plaintiffs assert the Project did not consider the impacts reduction in

46

hiding and thermal cover will have on moose in the Project area. First, because the

Project will not treat old growth, and because moose are not an old growth obligate

species, SmithShields 001107, the Forest Service reasonably omitted consideration

of the effects of old growth treatment upon moose.

Next, the Wildlife Report states that

> [m]oose . . . populations have experienced fluctuations at local and regional scales, due to a variety of complex ecological factors. The major impact to . . . moose under the proposed treatment would be a reduction in hiding and thermal cover. While reduction in cover is not always desirable in the project area, they are occurring anyway due to epidemic levels of insect and disease activity. Proposed treatments are designed to reduce tree mortality from insects and improve overall forest health in the project area. Therefore, we feel that the proposed action, while imparting short-term negative impacts, would benefit . . . moose over time by maintaining habitat integrity and providing cover to a higher degree than is expected if no treatments were to occur.

SmithShields 002642. The Forest Service considered the impacts of reducing

hiding and thermal cover upon moose.

### D. Smith Shields Project and HFRA

Plaintiffs claim the Smith Shields Project (1) violates the HFRA old growth

retention requirement and (2) violates Gallatin Forest Plan soil standards.

Plaintiffs' argument does not succeed.

### 1. Old Growth Requirement

Projects approved under HFRA must be carried out in a manner that

"maximizes the retention of old-growth and large trees, as appropriate for the

forest type, to the extent that the trees promote stands that are resilient to insects and disease." 16 U.S.C. § 6591b(b)(1)(A). Plaintiffs argue that the Project violates HFRA because it does not requiring maximizing retention of large trees and old growth. However, the Decision Memo states "[t]he largest and healthiest trees, as appropriate for the forest type, habitat type, and old growth group will be retained to the extent that the trees promote stands that are resilient to insects and disease, fire, and changing climate." SmithShields 014434. That requirement is in line with HFRA's old growth mandate. Contrary to Plaintiffs' interpretation, HFRA does not require that all healthy large trees be retained. Instead, the maximization requirement holds to the extent it is "appropriate for the forest type" and "promote[s] stands that are resilient to insects and disease." 16 U.S.C. § 6591b(b)(1)(A). Further, the statute calls for the exercise of Forest Service expertise in determining what is appropriate to maximize retention. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (1983).

Plaintiffs again assert the Forest Service "has done nothing to demonstrate that it is not logging old-growth forest." (Doc. 13 at 29.) That is untrue. The Forest Service identified units with possible old growth, and proposes no harvest or treatment in old growth or potential old growth stands. SmithShields 001185. To the extent Plaintiffs argue the Forest Service erred by failing to consider distribution of old growth, they have not shown viability concerns for old growth

in the Crazy Mountains or Project area. SmithShields 001185 (Crazy Mountains contain 17% old growth, Forest Plan calls for retaining 10%).

## 2. Soil Productivity Standards

Plaintiffs further claim the Project runs afoul of HFRA by violating the Forest Plan's regional soil standard. The Farm Bill Amendment requires that all projects it authorizes "be consistent" with the Forest Plan for the unit of the National Forest System containing the project. 16 U.S.C. § 6591b(e). Plaintiffs note that Unit #17 in the Project area has a 16% detrimental disturbance, and assert that that percentage violates the Gallatin Forest Plan's 15% disturbance soil standard. But, as Defendants note, the 15% standard comes from the Region 1 Supplement to Forest Service Manual 2250 Soil Management, which is not part of the Forest Plan and therefore cannot provide the basis for a HFRA violation.

In any event, Unit #17 actually complies with the 15% disturbance soil standard. The standard requires that, in areas "where more than 15 percent detrimental soil conditions exist from prior activities," further activities not result in further cumulative disturbance. SmithShields 014238. Because analysis of Unit 17 found 16% existing detrimental disturbance, *id.* at 001411, the Forest Service eliminated road building from Unit 17 and determined it could only be harvested in winter conditions, *id.* at 014404. With those changes, the Forest Service determined the Project would not increase detrimental soil disturbance above the

49

existing 16%. *Id.* at 001411, 001397–98.

## CONCLUSION

Plaintiffs have not shown that (1) the Designation violated NFMA, NEPA, or the ESA (First Claim); (2) the Project threatens Canada lynx in violation of NFMA, NEPA, and the ESA (Second Claim); (3) the Amendment and the Project violate NEPA and NFMA as relates to Amended Standard 6(a)(5) (Third Claim); (4) the Amendment and the Project violate NEPA and NFMA as relates to Amended Standard 6(c)(2) (Fourth Claim); (5) the Project violates HFRA by failing to consider best available science and maximize old growth retention (Fifth Claim); (6) the Project violates NEPA and NFMA by relying on an absent management indicator species (Sixth Claim); or (7) the Project violates NEPA and NFMA by failing to comply with a soil standard (Seventh Claim). Accordingly,

IT IS ORDERED that Defendants' motion to strike (Doc. 29) is GRANTED in PART. The declarations attached to the Complaint are stricken except to the extent the Johnson declarations establish standing for Native Ecosystems Council.

IT IS FURTHER ORDERED that Plaintiffs' motion to supplement (Doc. 38) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment (Doc. 12) is DENIED. Defendants' motion for summary judgment (Doc. 25) is GRANTED.

The Clerk of Court is directed to enter judgment in favor of Defendants and against Plaintiffs and close the case file.

DATED this _1st_ day of _August_ 2018.

_15:29 P.M._

Donald W. Molloy, District Judge
United States District Court